Argued and submitted September 28, 1998; resubmitted En Banc March 3, reversed and remanded with instructions on appeal; affirmed on cross-appeal April 28, 1999

Jennifer MACCRONE,
*Appellant - Cross-Respondent,*

*v.*

EDWARDS CENTER, INC.,
an active Oregon non-profit corporation,
*Respondent - Cross-Appellant.*

(9509-06509; CA A95658)

980 P2d 1156

Gregory Kafoury and Mark McDougal argued the cause and filed the briefs for appellant - cross-respondent.

I. Franklin Hunsaker argued the cause for respondent - cross-appellant. With him on the briefs was Bullivant, Houser, Bailey, Pendergrass & Hoffman.

Before Deits, Chief Judge, and Edmonds, De Muniz, Landau, Haselton, Armstrong, Linder, Wollheim, Kistler, and Brewer, Judges.

EDMONDS, J.

Deits, C. J., dissenting.

**EDMONDS, J.**

Plaintiff was awarded judgment against defendant[1] for intentional infliction of emotional distress and appeals the trial court's remittitur of the jury's punitive damage award. Defendant cross-appeals and assigns error to: (1) the trial court's denial of a directed verdict on the issue of liability; (2) the trial court's refusal to instruct the jury that defendant was not liable for the consequences of a third-party's attack on plaintiff; (3) the trial court's denial of defendant's motion for a directed verdict on the issue of punitive damages; and (4) the denial of several other post-trial motions. We reverse on plaintiff's appeal and remand with instructions to reinstate the jury's punitive damage award and affirm on defendant's cross-appeal.

We state the facts in the light most favorable to plaintiff. *See Brown v. J. C. Penney Co.*, 297 Or 695, 705, 688 P2d 811 (1984). After moving to Portland, plaintiff obtained a position as a caregiver at a residential facility for the developmentally disabled that defendant operated. The position required that plaintiff stay overnight with the facility's clients. She had had prior experience working with the developmentally disabled. Before she began work, defendant provided plaintiff with 18 hours of training, which included 10 hours of classroom instruction. According to plaintiff, her training included reading and signing various documents and being informed about blood-borne pathogens and the dispensing of medication. In addition, she observed the operation of the residential home to which she had been assigned to work. She also spoke to the facility's manager about each of the five clients who lived at the home. According to plaintiff,

---

[1] In *Wheeler v. Marathon Printing, Inc.*, 157 Or App 290, 974 P2d 207 (1998), the issue on appeal was Marathon's direct liability for the intentional infliction of emotional distress one employee caused another rather than its vicarious liability. In this case, the jury was instructed:

"An employer is liable for the acts or omissions of its employees. Doug Taylor [the manager] was the employee of the defendant, the Edwards Center, Incorporated. So, any fault of Doug Taylor is the fault of the defendant, Edwards Center, Inc."

Defendant did not except to this instruction. Thus, this case was tried on a vicarious liability theory, and at issue is whether the manager's conduct is tortious and defendant's vicarious liability for that conduct.

the manager indicated that one client, Michelle, merely liked to act tough. No one told her that Michelle was prone to having violent outbursts.

When plaintiff arrived for her first day of work on May 12, 1994, she believed that the manager would remain at the facility until she dispensed medication to the clients after dinner. However, the manager told plaintiff that he was involved with the Special Olympics and had to make a trip to California the next day. He assured plaintiff that everything would be fine, gave plaintiff his home and cellular telephone numbers and instructed her to call if anything happened.

Later in the day, plaintiff was confronted with a dispute between Michelle and another client, Lori. Michelle was dissatisfied with plaintiff's resolution of the conflict and punched Lori. According to plaintiff, Lori "flopped like a rag doll" onto the couch, and Michelle continued to assault her. Plaintiff pleaded with Michelle to stop punching Lori, but she refused. She then tried unsuccessfully to restrain Michelle. At that point, Michelle grabbed plaintiff, shook her, threw her to the ground and then climbed on top of her. When plaintiff tried to push Michelle off, Michelle grabbed plaintiff's hands and forced them across plaintiff's throat. Michelle alternated between squeezing plaintiff's wrists until her hands turned blue from lack of circulation and leaning on plaintiff's wrists, which cut off her air supply. Plaintiff tried to be passive and to reason with Michelle. Plaintiff indicated that she "had to sort of balance the two because [she] would start running out of air, and [she] would [have to] sort of save enough air that [she] could ask [Michelle] to let go of [her] neck." After 10 to 15 minutes, another client, Brian, asked Michelle if she wanted to watch a television show. According to plaintiff, Michelle laughed, released plaintiff's wrists, helped plaintiff stand up and indicated that she wanted to be friends with plaintiff.

Plaintiff immediately telephoned the manager and spoke with him for approximately 10 to 15 minutes. She testified that she had difficulty breathing during the call because she was crying. Eventually, she was able to explain to the manager that Michelle had tried to strangle her. After plaintiff requested that the manager return to the facility, he

inquired as to whether Michelle was hurting anyone at that time and whether plaintiff's behavior had caused the outburst. He indicated that it would be better for plaintiff to remain there alone because he thought that his return to the facility would reinforce Michelle's behavior. He also told plaintiff that Michelle had engaged in those sorts of outbursts in the past and that it was unlikely that there would be another problem that night. Ultimately, he refused to come to the facility, despite plaintiff's plea.

When the manager refused to come to the facility, plaintiff telephoned her husband. After they conversed, plaintiff agreed to call him every 30 minutes. Plaintiff made dinner for the clients, dispensed their medication and allowed Lori and Brian to remain with her in the office. Michelle and the two other clients went to bed. Later, while plaintiff was on the phone with her husband, Michelle appeared in the doorway to the office. She blocked the entrance and indicated that she was "just watching" plaintiff. Plaintiff shut and locked the door in Michelle's face. Again, she called the manager and insisted on leaving the facility. Eventually, the manager instructed plaintiff to call the on-call coordinator to obtain approval for him to return to the facility, and plaintiff left.

On cross-examination, when asked whether the manager intended to cause her emotional distress, plaintiff stated:

"I don't see how he could have avoided intending me to be upset. He knew how upset I was. I communicated that very clearly to him. He was well aware of my situation and he chose not to come. I have a hard time believing that he did not intend for me to suffer more. He certainly knew that I would.

"* * * * *

"He knew that I would suffer because [Michelle] had tried to strangle me and kill me and then he knew that I would suffer because he knew that she had a really long history of attacking people before, that this was commonplace for her. I have a hard time believing that he didn't know that it was likely."

Plaintiff did not return to work after the events of May 12, 1994.

Thereafter, plaintiff began experiencing panic attacks, developed phobias, was easily startled and became overly vigilant for danger. Her psychologist diagnosed her as having post-traumatic stress disorder, which he defined as "a very complex reaction to an identified traumatic event," such as a sudden event involving physical injury or in which the person perceives that he or she is going to die. According to the psychologist, individuals with post-traumatic stress disorder experience nightmares and flashbacks and relive the event that caused the disorder. He indicated that such individuals suffer from an overwhelming anxiety that causes them to "shut down" and "avoid things they normally enjoy because there's no pleasure." According to the psychologist, these individuals often experience a "shattering of assumptions" including the individuals' thoughts about themselves, the world, other people and the concept of fairness. He testified that individuals with post-traumatic stress disorder avoid situations that remind them of the traumatic event, and, if they accidentally encounter a similar situation, they respond with panic attacks or tremendous fear. He also testified that individuals with post-traumatic stress disorder "remain vulnerable and find it [easier] to get anxious or develop new fears." He concluded that there is a measure of permanence in plaintiff's condition and that, in his opinion, if the manager had supported plaintiff by coming to the facility in response to the first call, the post-traumatic stress disorder would not have developed.

Eventually, plaintiff filed a complaint against defendant for intentional infliction of emotional distress. The complaint alleges:

"The above statements by the house manager which blamed plaintiff for the violent incident, minimized the continuing threat which she faced, and indicated that plaintiff was incompetent in her performance of their duties, all coupled with the house manager's refusal to come to her aid when he knew that she was hysterical and in reasonable fear for her life, were actions beyond the limits of social toleration and were made for the deliberate purpose of inflicting great distress, fear, guilt, and feelings of incompetence

in the plaintiff, and they did in fact cause plaintiff severe emotional distress. As a result thereof, plaintiff has developed post traumatic stress disorder, resulting in physical injury and illness, and has been and is plagued with feelings of fear, incompetence, inferiority, and helplessness, and will permanently suffer from such conditions and feelings, all to her non-economic damage in the amount of $500,000."

Plaintiff also sought $2,000,000 in punitive damages.

Defendant moved for a directed verdict on the grounds that plaintiff had not proven the requisite intent to inflict emotional distress and that the manager's conduct did not rise to the level of an extraordinary transgression of the bounds of socially tolerable conduct. Defendant also moved for a directed verdict on the ground that plaintiff was not entitled to recover punitive damages as a matter of law. The trial court denied the motions. A jury found in favor of plaintiff and awarded her noneconomic damages of $275,000 and punitive damages of $1,250,000. Defendant then moved for a judgment notwithstanding the verdict, a new trial and to have the punitive damage award set aside. The trial court reduced the punitive damage award to $1,000,000 but denied the other motions.

■■ Because defendant's assignments of error on cross-appeal could be dispositive, we begin by reviewing them. First, defendant assigns error to the trial court's denial of its motion for a directed verdict on the ground that plaintiff failed to prove that it acted with the requisite intent and that its conduct was an extraordinary transgression of the bounds of socially tolerable conduct. Ordinarily, to prevail on a claim for intentional infliction of emotional distress (IIED), a plaintiff must prove that:

> " '(1) the defendant intended to inflict severe emotional distress on the plaintiff, (2) the defendant's acts were the cause of the plaintiff's severe emotional distress, and (3) the defendant's acts constituted an extraordinary transgression of the bounds of socially tolerable conduct.' " *McGanty v. Staudenraus*, 321 Or 532, 543, 901 P2d 841 (1995) (quoting *Sheets v. Knight*, 308 Or 220, 236, 779 P2d 1000 (1989)).

In general, the element of intent exists " *'where the actor desires to inflict severe emotional distress, and also where he knows that such distress is certain, or substantially certain, to result from his conduct.'* " *McGanty*, 321 Or at 550 (quoting *Restatement (Second) of Torts* § 46 comment i (1965)) (emphasis in original).

■    Defendant contends that this case differs from the ordinary IIED case because ORS 656.018 and ORS 656.156[2] require that plaintiff must prove that defendant, as plaintiff's employer, had the deliberate intent to injure her in order to

---

[2] Currently, ORS 656.018 provides, in part:

"(1)(a)  The liability of every employer who satisfies the duty required by ORS 656.017(1) is exclusive and in place of all other liability arising out of injuries, diseases, symptom complexes or similar conditions arising out of and in the course of employment that are sustained by subject workers, the workers' beneficiaries and anyone otherwise entitled to recover damages from the employer on account of such conditions or claims resulting therefrom, specifically including claims for contribution or indemnity asserted by third persons from whom damages are sought on account of such conditions, except as specifically provided otherwise in this chapter.

"* * * * *

"(2)  The rights given to a subject worker and the beneficiaries of the subject worker under this chapter for injuries, diseases, symptom complexes or similar conditions arising out of and in the course of employment are in lieu of any remedies they might otherwise have for such injuries, diseases, symptom complexes or similar conditions against the worker's employer under ORS 654.305 to 654.335 or other laws, common law or statute, except to the extent the worker is expressly given the right under this chapter to bring suit against the employer of the worker for an injury, disease, symptom complex or similar condition.

"* * * * *

"(7)  The exclusive remedy provisions and limitation on liability provisions of this chapter apply to all injuries and to diseases, symptom complexes or similar conditions of subject workers arising out of and in the course of employment whether or not they are determined to be compensable under this chapter."

In 1995, the legislature amended the language of ORS 656.018(1)(a) and (2) and added what is now ORS 656.018(7). These amendments apply to "all claims or causes of action existing or arising on or after the effective date of this Act, regardless of the date of injury or the date a claim is presented." Or Laws 1995, ch 332, § 66(1). The 1997 amendments did not affect the substance of the quoted language.

ORS 656.156(2) currently provides, in part:

"If injury or death results to a worker from the deliberate intention of the employer of the worker to produce such injury or death, the worker * * * may take under this chapter, and also have cause for action against the employer, as if such statutes had not been passed, for damages over the amount payable under those statutes."

avoid the exclusivity provision of the Workers' Compensation Law and that proof of negligence, gross negligence, recklessness or conscious indifference is insufficient to meet that requirement.[3] Defendant asserts that there is no evidence that its manager acted with the requisite intent. Plaintiff counters that the jury was entitled to infer from the circumstances surrounding the manager's refusal to come to the facility that he acted with the deliberate intent of causing her emotional injury.

We turn then to the evidence in light of the parties' arguments and the applicable law. "Because plaintiff ha[s] a verdict, we cannot set it aside unless we can affirmatively say that there is no evidence from which the jury could have found the facts necessary to establish the elements of plaintiff's cause of action." *Brown*, 297 Or at 705. The jury could have found that the manager knew that plaintiff was distressed when she called him immediately after Michelle had attempted to strangle her and that, despite her request that he return to the facility, he chose to leave her alone with her attacker. Based on that evidence, a jury reasonably could infer that the manager wished to inflict more emotional distress on plaintiff, knowing that she was suffering severe emotional distress because of the attack. Such an inference suffices to meet the requisite intent under ORS 656.018 and ORS 656.156.[4]

---

[3] To demonstrate "deliberate intent" under ORS 656.156(2), the employee must prove that: (1) the employer's act was deliberate or, in other words, that the employer had an opportunity to weigh the consequences and chose among courses of action, *Lusk v. Monaco Motor Homes, Inc.*, 97 Or App 182, 188, 775 P2d 891 (1989), and (2) the employer specifically intended to injure the employee or one similarly situated, *id.*; *Kilminster v. Day Management Corp.*, 323 Or 618, 631, 919 P2d 474 (1996). In *Davis v. United States Employers Council, Inc.*, 147 Or App 164, 176, 934 P2d 1142, *rev den* 325 Or 368 (1997), we described the statute as requiring proof that the employer acted or did not act because it 'wished to injure' the employee or someone similarly situated."

[4] The dissent would hold that a reasonable factfinder could *not* infer that Taylor's refusal to come to plaintiff's aid was motivated by an intention to subject her to additional emotional distress and potential physical distress inflicted by Michelle, and accordingly, it would vacate the jury's verdict by directing a verdict in favor of defendant. In support of its position, the dissent draws inferences and relies on evidence favorable to defendant, contrary to the applicable legal rule in determining whether a party is entitled to a directed verdict as a matter of law. The jury in this case was entitled to draw any inference "from facts which reason dictates." *Judson v. Bee Hive Auto Service Co.*, 136 Or 1, 10, 294 P 588, 297 P 1050 (1931). An undeclared intention of an actor is hardly susceptible to direct evidence.

■■     Plaintiff must also prove that defendant's conduct constituted an extraordinary transgression of the bounds of socially tolerable conduct. *McGanty*, 321 Or at 543. Whether defendant's conduct rises to that level of severity is initially a question of law, viewing the evidence in the light most favorable to plaintiff. The inquiry is whether defendant's conduct constitutes "extraordinary conduct which a reasonable jury could find beyond the farthest reaches of socially tolerable behavior." *Hall v. The May Dept. Stores*, 292 Or 131, 137, 637 P2d 126 (1981). *Accord Tenold v. Weyerhaeuser Co.*, 127 Or App 511, 517, 873 P2d 413 (1994), *rev dismissed* 321 Or 561 (1995). "Conduct that is merely 'rude, boorish, tyrannical, churlish and mean' does not satisfy that standard[.]" *Watte v. Edgar Maeyens, Jr., M.D., P.C.*, 112 Or App 234, 239, 828 P2d 479, *rev den* 314 Or 176 (1992) (quoting *Patton v. J. C. Penney Co.*, 301 Or 117, 124, 719 P2d 854 (1986)). A court may consider the existence of special relationships between the parties in determining the issue. *Rockhill v. Pollard*, 259 Or 54, 60, 485 P2d 28 (1971). *See McGanty*, 321 Or at 545 (reasoning that the special relationship discussion in *Rockhill* applies only to the conduct element of the tort). An employee and employer relationship is such a relationship. *Hall*, 292 Or at 138.

■     As we have said, the evidence supports the inference that defendant, knowing that plaintiff had been exposed to physical danger, declined to come to her assistance, intending that she be placed in further danger. In the context of an employer-employee relationship where the employer has the ability to extricate the employee from a dangerous situation in which it has placed her, we hold that that kind of conduct is so extraordinary that a jury reasonably could find it to be beyond the furthest reaches of the bounds of socially tolerable conduct. We conclude that the trial court did not err in denying the motion for a directed verdict on the grounds that

---

Juries necessarily discern an actor's intent by the actor's conduct and expressions in the midst of the prevailing circumstances. In light of plaintiff's communications to Taylor and her unobjected-to testimony characterizing Taylor's refusal as intended to make her "suffer more," the jury had before it evidence of Taylor's mind set regarding plaintiff's dilemma. From that evidence, it could have drawn a number of different inferences as to his intention. The fact that it chose the inference that it did rather than the inference that the dissent proposes does not make the jury's choice unreasonable or the denial of the motion for directed verdict error.

plaintiff failed to prove the requisite intent and that defendant's conduct was not socially intolerable.[5]

Second, defendant contends that the trial court committed prejudicial error when it refused to give the following requested instruction to the jury:

> "In the course of her complaint, plaintiff describes two separate sets of traumatic occurrences that took place on May 12, 1994. First she alleges that Miche[l]le * * * assaulted and battered her by choking her to the point of unconsciousness and that late that evening, Miche[l]le * * * stood over her staring at her and trying to intimidate her.

> "Second, she alleges that the house manager, Doug Taylor, on two separate occasions that evening refused to come to her and refused to relieve her, telling her that she was responsible for the assault by Michel[l]e.

> "I instruct you that Edwards Center is not liable for the consequences of assault or the attempted intimidation by Michel[l]e * * *. It can only be held liable for the conduct of Doug Taylor. It is your duty as jurors to separate the consequences of the conduct of the two individuals and to determine whether the conduct of Doug Taylor was intended to cause and, in fact, did cause plaintiff sever[e] emotional distress as I have defined that term for you [in the] course of these instructions.

> "If you find either that Doug Taylor did not intend to cause plaintiff to suffer severe emotional distress or that plaintiff did not suffer severe emotional distress as a result of Doug Taylor's conduct, then your verdict will be for defendant."

Defendant argues that the instruction was necessary to prevent the jury from awarding damages based on Michelle's assault on plaintiff. In determining whether the

---

[5] The dissent asserts that defendant's conduct was insufficient to support an intentional infliction of emotional distress claim as a matter of law because "[plaintiff] accepted and was performing a job that, subjectively or objectively, had dangerous aspects." 160 Or App at 114. There are many jobs involving interactions with human beings in which there are inherently dangerous aspects. The extent to which plaintiff assumed the risk that she would be without aid to deal with Michelle's behavior was an issue of fact for the jury to decide based on conflicting evidence about plaintiff's job description and what she was told about Michelle's propensities.

instruction was necessary, we examine the other instructions that the trial court gave to the jury. The trial court instructed the jury as to the elements of the tort and gave the following instruction on causation:

> "In order to be a cause of damage an act or omission must be a substantial factor in producing the damage. A substantial factor is an important or material factor and not one that is insignificant.
>
> "Many factors or things may operate either independently or together to cause damage. In such a case each may be the cause of the damage, even though the others would have been sufficient of themselves to cause the same damage.
>
> "You need not find that the conduct of the defendant was the only cause of the damage."

In addition, the trial court's instructions with regard to damages included the statement that "[i]n deciding the amount of any such damages, you must determine each of the items of damages that I'm going to mention to you in a moment; provided, you find the damages to have been sustained by her as a result of the defendant's fault."

■■ "It is not error for a trial court to refuse to give a requested instruction if the instruction given by the court, although not in the form requested, adequately covers the subject of the requested instruction." *State v. Tucker*, 315 Or 321, 332, 845 P2d 904 (1993). We hold that the trial court's instructions regarding the elements of the tort, causation and damages covered the same subject matter as defendant's requested instruction. When viewed as a whole, the instructions told the jury that the defendant could be liable only if its conduct was a substantial factor in causing the emotional distress and that damages could be awarded only if they were sustained as a result of defendant's conduct. Those instructions adequately separated the damages caused by the manager's conduct from those caused by Michelle's conduct. Thus, the trial court did not err in refusing to give the instruction that defendant requested because its other instructions covered the same subject.

Defendant's next assignment of error is that, "[t]he award of punitive damages should be set aside or at least further reduced because Defendant's conduct, even if tortious, was not extraordinary, arbitrary, aggravated, aggressive, malicious or unconscionable." In its argument, defendant makes three points: (1) "Defendant's conduct did not rise to the degree of reprehensibility to justify an award of punitive damages"; (2) "the jury had insufficient evidence upon which it could rationally base an award of punitive damages"; and (3) "[t]he punitive damage[ ] award should at least be further reduced because it is excessive."[6]

During the trial, defendant moved for a directed verdict as to punitive damages on the ground that punitive damages could not be recovered for oral communications. After trial, defendant moved for a judgment notwithstanding the verdict and a new trial. Defendant also moved to set aside the jury's punitive damage award. Defendant presented two issues to the trial court in that motion. The first issue was whether the punitive damage award should be set aside because defendant's conduct was not sufficiently aggravated and because the jury had insufficient evidence on which it rationally could base the award. The second issue was whether the punitive damage award should be set aside because "it is unconstitutionally standardless, excessive and disproportionate in violation of the Due Process Clause of the Fourteenth Amendment of the Constitution of the United States."

In its order, the trial court ruled:

"The court grants defendant's motion to reduce the punitive damage award and hereby reduces the punitive damage award to one million dollars. All other motions relating to the award of punitive damages as well as Motions for Judgment Notwithstanding the Verdict and New Trial are denied."

---

[6] ORS 18.537 currently addresses the standards for awarding and reviewing punitive damage awards. That statute applies to actions commenced on or after September 9, 1995. Or Laws 1995, ch 688, § 5. Because this action was commenced on September 8, 1995, ORS 18.537 does not apply.

Thus, the trial court appeared to treat each issue presented in defendant's motion to set aside the punitive damage award as a separate motion.

■ In his motion for a directed verdict on the issue of punitive damages before the matter was submitted to the jury, defendant did not argue to the trial court that its conduct was not sufficiently aggravated nor that there was insufficient evidence to support an award. As we stated in *Gardner v. First Escrow Corp.*, 72 Or App 715, 727-28, 696 P2d 1172, *rev den* 299 Or 314 (1985):

> "A motion for a directed verdict must be made before the moving party may move for a judgment notwithstanding the verdict. ORCP 63A; *Stark v. Henneman*, 250 Or 34, 36, 440 P2d 364 (1968). The grounds asserted in the motion for judgment notwithstanding the verdict must previously have been raised in a motion for a directed verdict and in a manner that specifically brings the issue to the trial court's attention."

Accordingly, the first two points of defendant's assignment of error regarding the sufficiency of the evidence for an award of punitive damages are not cognizable on appeal. Moreover, the denial of defendant's motion for a new trial suffers from the same deficiency.

Finally, we turn to defendant's motion to set aside the punitive damage award on the ground that it was constitutionally excessive. The motion challenges the amount of a punitive damage award rather than its propriety. Such a motion cannot be required to be made during trial because the jury has not yet made its award. We hold that defendant's post-trial motion that challenged the jury's punitive damage award on the ground that it was constitutionally excessive is properly before us. Although the trial court granted defendant's motion in part and reduced the award, defendant contends on appeal that the award should be further reduced because it is excessive. The issue of whether the jury's award is excessive is the same issue that plaintiff raises on appeal. We turn then to plaintiff's appeal.

■ Plaintiff assigns error to the trial court's reduction of the punitive damage award from $1,250,000 to $1,000,000.

She specifically contends that the trial court erred by reducing the jury's award based on its knowledge of other punitive damage awards. Before we can address the merits of the issue, we must identify our standard of review.

Defendant contends that we should apply an abuse of discretion standard. We rejected defendant's contention in *Stranahan v. Fred Meyer, Inc.*, 153 Or App 442, 467 n 21, 958 P2d 854, *rev allowed* 328 Or 115 (1998), when we said:

"Defendant suggests that this court adopt an abuse of discretion standard of review as to whether a trial court properly reduced a punitive damages award. That standard of review does not comport with the Oregon Supreme Court's approach to this issue in *Oberg*: 'We are in as good a position as would be the trial court to apply a legal standard to the evidence in the record.' *Oberg*, 320 Or at 552."

Plaintiff contends that we should apply the legal standard in *Oberg v. Honda Motor Co.*, 320 Or 544, 551, 888 P2d 8 (1995), *cert den* 517 US 1219 (1996), when reviewing the trial court's reduction of the punitive damage award. In *Oberg*, the Oregon Supreme Court stated that

"post-verdict judicial review of a jury's award of punitive damages is as follows: Was the award of punitive damages within the range that a rational juror would be entitled to award in the light of the record as a whole? The range that a rational juror is entitled to award depends, in turn, on the statutory and common law factors that the jury is instructed and permitted to consider when awarding punitive damages for a given claim." 320 Or at 551.

The purpose of the standard announced by the Oregon Supreme Court in *Oberg* was to provide judicial review of punitive damage awards in order to assure that they are not excessive in violation of the Due Process Clause of the federal constitution. *Blume v. Fred Meyer, Inc.*, 155 Or App 102, 110-11, 963 P2d 700 (1998). After this standard was announced, the United States Supreme Court, in *BMW of North America, Inc. v. Gore*, 517 US 559, 116 S Ct 1589, 134 L Ed 2d 809 (1996), described three guideposts to identify constitutionally excessive awards. We described the *BMW* analysis in *Parrott v. Carr Chevrolet, Inc.*, 156 Or App 257, 275, 965 P2d 440 (1998), *rev allowed* 328 Or 418 (1999):

"Under *BMW*, the starting point for examination of a punitive damage award is identification of the state's interests that a punitive award is designed to serve. Underlying the inquiry are elementary notions of fairness: that persons must receive fair notice of the conduct that will subject them to punishment and also of the severity of the penalty the state may impose. The United States Supreme Court articulated three 'guideposts' to assist in evaluating whether the award exceeds constitutional limits: (1) the degree of reprehensibility of the defendant's conduct; (2) the disparity between the harm or potential harm suffered and the punitive damage award; and (3) the difference between the award and the civil or criminal penalties authorized or imposed in comparable cases. Although those guideposts are not exclusive, other considerations must be grounded in clear legal principles or historical or community-based standards." (Citations omitted.)

In *Blume*, we held that *BMW* altered the limited role of the reviewing court under the *Oberg* standard and reasoned that:

"a reviewing court's determination of whether the punitive damage award is unconstitutionally excessive is not dependent on instructions to the jury or on the jury's considerations. Under *BMW*, although the reviewing court accepts the facts and inferences as the jury found them, evaluating whether a punitive damage award is excessive requires examination of, but not deference to, the jury's award." 155 Or App at 113 (footnote omitted).

Thus, when a party assigns error in this court to a trial court's reduction of a jury's punitive damage award, we will make an independent assessment of the jury's award to determine whether it is constitutionally excessive in violation of due process under the *BMW* guideposts without regard to the trial court's reasoning.

First, we examine the reprehensibility of defendant's conduct, which may be the most important factor and which focuses our attention on whether the punitive award reflects the enormity of defendant's conduct. *BMW*, 517 US at 575. As the Court indicated in *BMW*, "[t]hree aggravating factors associated with particularly reprehensible conduct are (1) whether defendant's conduct was violent or threatened violence; (2) whether defendant acted with trickery or

deceit as opposed to mere negligence; and (3) whether defendant has engaged in repeated instances of misconduct." *Parrott*, 156 Or App at 276.

■    Here, the manager's conduct toward plaintiff was not an affirmative act of violence or threatened violence toward plaintiff. However, as a result of his refusal to return to the facility after Michelle attempted to strangle her, plaintiff remained alone at the facility where there was a danger that Michelle would physically harm her. In addition, the evidence supports the inference that the manager acted with a specific intent or a wish to injure plaintiff. Such conduct is certainly more reprehensible than mere negligent conduct. The final factor involving repeated misconduct is not present here because there is no evidence that defendant intentionally inflicted severe emotional distress on other employees. However, in light of the egregious nature of the manager's conduct which caused plaintiff to remain with her attacker and to be subject to a continuous threat of physical violence, the degree of reprehensibility is significant.

■    Second, we examine the disparity between the harm suffered or the potential harm and the punitive damage award. The Supreme Court has indicated that:

"[w]e need not, and indeed we cannot, draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case. We can say, however, that general concerns of reasonableness * * * properly enter into the constitutional calculus." *Pacific Mut. Life Ins. Co. v. Haslip*, 499 US 1, 18, 111 S Ct 1032, 113 L Ed 2d 1 (1991).

Although in *Haslip* the Supreme Court concluded that a ratio of punitive damages to actual harm that was more than 4 to 1 "may be close to the line" of constitutional impropriety, 499 US at 23, the Court in *BMW* noted that:

"low awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages. A higher ratio may also be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine." 517 US at 582.

Here, plaintiff's psychologist opined during his testimony that, if the manager had responded to plaintiff's call for help by taking her seriously and had validated her fear by providing support, she would not have developed the post-traumatic stress disorder. The evidence indicates that plaintiff suffers from panic attacks and phobias, is easily startled and is inappropriately fearful of danger. Her psychologist testified that individuals with post-traumatic stress disorder remain vulnerable and that there is "some measure of permanenc[e]" in plaintiff's condition. Thus, the ability of plaintiff to enjoy a productive and contented life has been significantly impaired as a result of defendant's conduct. The jury awarded plaintiff $275,000 in noneconomic damages and punitive damages of $1,250,000. The ratio between the punitive award and the award of noneconomic damages is approximately 4.5 to 1. In light of plaintiff's psychological condition and the fact that noneconomic damages for a post-traumatic stress disorder may have been difficult to calculate, the disparity between the award of compensatory damage harm and the award of punitive damages is reasonable in our view.

Finally, we examine the difference between the punitive damage award and the civil or criminal penalties that could be authorized or imposed for comparable conduct. In *BMW*, the Supreme Court indicated that considerable deference should be given to legislative sanctions for the conduct in issue. 517 US at 583. In this case, the parties do not cite to specific, comparable, legislative civil or criminal sanctions that the court should consider. However, the Workers' Compensation Law and the criminal penalties for menacing and harassment provide some insight into the grievousness of the manager's conduct. Additionally, we are mindful that the state's interest in allowing punitive damages is to punish willful, wanton or malicious wrongdoers and to deter the wrongdoers and others similarly situated from further engaging in such conduct. *Friendship Auto v. Bank of Willamette Valley*, 300 Or 522, 532, 716 P2d 715 (1986).

ORS 656.156 places employers on notice that, if they act with the deliberate intent to cause an employee severe emotional distress, they could be subject to a tort claim for intentional infliction of emotional distress in which a jury could award punitive damages. The gravamen of the crimes

of menacing, ORS 163.190,[7] and harassment, ORS 166.065,[8] are also analogous to the manager's conduct when it is considered as a manifestation of an intent to make plaintiff fearful. Menacing, a Class A misdemeanor, is currently punishable by imprisonment up to a maximum of one year, ORS 161.615(1), and a maximum fine of $5,000, ORS 161.635(1)(a). Harassment, a Class B misdemeanor, is currently punishable by imprisonment up to six months, ORS 161.615(2), and a maximum fine of $2,000, ORS 161.635(1)(b). As we reasoned in *Blume*, "[a]ssuming that an incarcerative sanction may fairly be viewed as some notice of a possibly severe punitive damage for a corporate defendant in a somewhat analogous civil action," 155 Or App at 118, the possibility of incarceration demonstrates the seriousness of the manager's conduct.

■　The Court in *BMW* also examined under this guidepost whether a lesser penalty would have the effect of deterring future misconduct. 517 US at 584. The *BMW* court ultimately concluded that the defendant's conduct, which was analogous to a violation of the state's deceptive trade practices statutes, was not sufficiently egregious to justify a punitive damage award of $2,000,000 when the only injury suffered by the plaintiff was an economic one, reflected by compensatory damages of $4,000. 517 US at 565, 584-85. In *Blume*, the plaintiff had been stopped in the defendant's store and her bag had been searched pursuant to the defendant's policy to randomly check customers for receipts. 155 Or App at 104-05. We upheld a punitive damage award of $450,000 when compensatory damages were assessed at $25,000. *Id.* While we noted in that case that the random application of the defendant's policy could have resulted in innocent people being accused of theft, we also indicated that the defendant's egregious conduct caused an injury that went beyond mere

---

[7] ORS 163.190(1) provides that

"[a] person commits the crime of menacing if by word or conduct the person intentionally attempts to place another person in fear of imminent serious physical injury."

[8] ORS 166.065 provides, in part:

"(1) A person commits the crime of harassment if the person intentionally:

"(a) Harasses or annoys another person by:

"(A) Subjecting such other person to offensive physical contact[.]"

economic harm and instead interfered with plaintiff's right of personal freedom. *Id.* at 114, 119. In this case, as in *Blume*, the manager's refusal to return to the facility with the deliberate intent of causing her emotional distress is conduct that caused more than mere economic loss. Plaintiff has suffered an additional injury, permanent damage to her mental health. The appropriateness of a penalty to deter conduct that causes injury to personal health may reasonably include an amount of money that is commensurate not only with the nature of the conduct but also with the relationship of the parties. In light of the facts of this case, we are unable to say that a lesser penalty would deter future misconduct.

We have independently examined the jury's award in light of the *BMW* guideposts that necessarily establish permissible awards. So long as the jury's award does not cross the line between permissible and excessive awards, it is not subject to reduction by the trial court. For the reasons stated above, we hold that the jury's punitive damage award was not excessive. Accordingly, we reverse the trial court's reduction of the punitive damage award and remand with instructions to reinstate the jury's verdict.

On appeal, reversed and remanded with instructions to reinstate jury's verdict; on cross-appeal, affirmed.

**DEITS, C. J.,** dissenting.

As the majority correctly describes, the tort of intentional infliction of emotional distress (IIED) requires proof of the elements that the "defendant intended to inflict severe emotional distress on the plaintiff" and that the defendant's act giving rise to the distress constituted "extraordinary conduct which a reasonable jury could find beyond the farthest reaches of socially tolerable behavior." The Supreme Court has emphasized that the intent element and the "extraordinary conduct" elements are separate and distinct and that both must be present in order for the tort to be found. *See Madani v. Kendall Ford, Inc.,* 312 Or 198, 818 P2d 930 (1991). In my view, plaintiff's proof here did not support a finding of either element, and I would hold that the trial court erred by denying defendant's motion for a directed verdict.

Reduced to essentials, the majority reaches its contrary conclusion in both regards on the theory that the two necessary findings can be inferred from the fact that defendant's manager, Taylor, did not return to the care facility pursuant to plaintiff's request when she made the first of her telephone calls to him after Michelle's aggressive outburst. The majority reasons that intent to inflict emotional distress could be found at the end of a chain of inferences, all based on that telephone conversation, that Taylor knew plaintiff was upset, that he nevertheless "chose to leave her alone with her attacker" and, hence, that he "wished to inflict more emotional distress on plaintiff, knowing that she was suffering severe emotional distress because of the attack." 160 Or App at 99. Similarly, the majority relies on the inference to which it considers the first phone call can give rise in reaching its conclusion that the nature of Taylor's act could be found to exceed the farthest reaches of socially tolerable behavior. The majority explains:

> "As we have said, the evidence supports the inference that defendant, knowing that plaintiff had been exposed to physical danger, declined to come to her assistance, intending that she be placed in further danger. In the context of an employer-employee relationship where the employer has the ability to extricate the employee from a dangerous situation in which it has placed her, we hold that that kind of conduct is so extraordinary that a jury reasonably could find it to be beyond the furtherest reaches of the bounds of socially tolerable conduct." 160 Or App at 100.

I disagree with the majority in both connections. I do not think that a reasonable factfinder could infer that Taylor's failure to send assistance to plaintiff in response to her first phone call can lead to a finding that he intended to inflict severe emotional distress on her. Plaintiff was performing the job that she had been hired for, had been trained for and had agreed to do. She had had 10 hours of classroom training and spent two additional four-hour training sessions at the home, during which she observed the facility and was given some information about the residents. She had been forewarned—although perhaps not sufficiently—about Michelle's "tough" disposition. Unfortunately, the predictable happened on her first night of work for defendant, and she

called for help. Taylor spoke with her, asking where Michelle was and if she posed a threat to anyone at that time. After receiving assurances from plaintiff that Michelle was not harming anyone, Taylor gave plaintiff affirmative reasons why his return to the facility at that time was not a good idea in terms of patient care and offered reassurances to plaintiff about the unlikelihood that Michelle's attack would continue or be repeated.

His prediction, arguably, was wrong. Further, it is quite inferable that he was aware that plaintiff was upset. He may have been negligent in his assessment of the situation and in not going to the facility himself or arranging in some other way to relieve plaintiff. However, the remaining links in the inferential chain from that point to a permissible finding of an intent to inflict emotional distress are simply not there.

Plaintiff was not in the position of a bystander, like a visitor to the facility who arrived at the wrong time and fell in harm's way. She had accepted employment as the nighttime attendant at the facility and was performing that job at the time that Michelle attacked and at the time that plaintiff called Taylor. There is no question that plaintiff was upset at the time of the call. However, there is also no question that the cause of her distress was an event that was very much within the contemplation of her employment. Taylor was clearly not the cause—let alone the intentional one—of the emotional distress that plaintiff was experiencing at the time she called him.

The majority's theory is that, because he did not send relief, it could be inferred that Taylor intentionally caused the *further* distress that plaintiff suffered after the first telephone call. The problem with that theory is that it converts what was, at worst, a negligent management decision into an intentional tort aimed at causing the continuation or worsening of an already existing circumstance that an arguably more opportune decision might have brought to a stop. There was absolutely no evidence, independent of the fact that he did not provide or send held to plaintiff in dealing with Michelle and her job, that Taylor intended to cause her

any harm whatever. In my view, the flow of permissible inferences from the fact on which plaintiff and the majority rely does not go beyond negligence. Moreover, that view is reinforced by the fact that Taylor *did* provide the relief that plaintiff wanted in response to her later call. For the foregoing reasons, I conclude that plaintiff failed in her proof of the intent element of IIED.

Even clearer, however, is that the conduct on Taylor's part that plaintiff alleged and proved, as a matter of law, was not of a kind that a trier of fact could reasonably find to be "beyond the farthest reaches of socially tolerable behavior." As noted above, the "intent" and the "conduct" elements of IIED are distinct from one another, and the Supreme Court has treated the distinction as a rigid one. To illustrate, the plaintiff in *Madani* alleged that he was fired from his employment because he refused a supervisor's order to pull down his pants and expose himself in a public place and that the termination, in turn, resulted in severe emotional distress. The plaintiff did not allege that the supervisor's order, independently of the discharge, was a cause of his distress. The Supreme Court held that the allegations failed to state a claim for IIED. It explained that, although the employer's motive or reason for the firing may have been relevant to the intent element of the tort, it was not relevant to whether the act that allegedly brought about the distress, *i.e.*, the firing itself, "extraordinarily transgressed the bounds of socially tolerable conduct." *Id.* at 204. The court continued:

> "[T]he act itself must be intolerable. The mere act of firing an employee, even if wrongfully motivated, does not transgress the bounds of socially tolerable behavior." *Id.*

The majority concludes that Taylor's conduct was susceptible to a finding of transgressing the farthest reaches of socially tolerable behavior, because he knew that plaintiff had been exposed to danger; he declined to come to her assistance, *intending* that she be placed in further danger; and that it is beyond the outer reaches of the tolerable for an employer with "the ability to extricate [an] employee from a dangerous situation in which it has placed her" to fail to do so. It is unclear whether, notwithstanding the Supreme Court's distinction between the two, the majority's analysis

blurs the line between the "intent" and the "conduct" elements.

Be that as it may, however, I do not agree with the majority's reasoning or its conclusion that the latter element could be found here. Defendant did not unilaterally place plaintiff in a dangerous situation; she accepted and was performing a job that, subjectively or objectively, had dangerous aspects. The majority's reasoning might be more persuasive, for example, in a situation where a defective wall collapses on an employee at the workplace and the employer is heedless of the employee's cries for assistance in extricating himself from the rubble. In this situation, however, any danger was inherent in the job itself. Plaintiff, a novice on the job, thought from the inception of Michelle's onslaught that relief or help was urgently needed. Rightly or wrongly, the manager of the center disagreed and left plaintiff to continue to perform her job without assistance, as he thought she could, and as she had agreed to do. Again, Taylor's decision may have been negligent. However, it surely was not an act that fell beyond the outside reaches of humanly acceptable behavior.

The rule that the majority would establish is operationally untenable. Under it, any employer could be found by a jury to have acted outside the bounds of social toleration if the employer failed or decided not to provide job reassignments or relief from duties in response to an employee's communication of a perceived danger in or related to the performance of the employee's job. Indeed, under the majority's analysis, an employee could have a viable claim for IIED against the employer for not relieving the employee of a putatively onerous job responsibility, under circumstances where the employee would not *necessarily* even be entitled to unemployment compensation benefits if the employee refused to perform. *See, e.g., Pintok v. Employment Division*, 32 Or App 273, 573 P2d 773 (1978).[1]

---

[1] I expressly note that my observation here is not directed at whether plaintiff would be entitled to such benefits if she sought them. Rather, my comments are directed at a general possibility that could arise in light of the rule for intentional tort liability that the majority develops here and in light of ORS chapter 657 as it has been applied to different facts.

In my view, when all is said and done, the majority gives too little regard to whether this case should have gone to the jury and too much to what the jury could have found once the case was submitted to it under instructions that presupposed that a viable claim for liability was before it. However, the decisive question before us is whether the case should have been taken from the jury on the ground that the facts here were such that, as a matter of law, plaintiff had no viable claim that defendant's actions ran afoul of either the "intent" or the "conduct" element of the tort. The majority acknowledges that the tenability of the claim, at least as to the latter element, "is initially a question of law." 160 Or App at 100. The case should not have gone beyond that initial question, either in the trial court or here.

It follows from what I have said that I would also hold that defendant did not have the requisite intent to come within ORS 656.156, and that the claim is therefore barred by the exclusive remedy provision of the Workers' Compensation Law, in addition to failing on its merits. Whether the action would be barred under ORS 656.156 and ORS 656.018 if it were tenable as a tort claim is a question I need not reach. *But see Davis v. United States Employers Council, Inc.*, 147 Or App 164, 934 P2d 1142, *rev den* 325 Or 368 (1997).

It also follows, *ipso facto*, from the holding that I would reach that the punitive damages award should be vacated in its entirety.

For the foregoing reasons I disagree with the majority's disposition of both the appeal and the cross-appeal, and I respectfully dissent.

Landau, Linder, and Kistler, JJ., join in this opinion.