Christine Anne HALBASCH, Plaintiff,

v.

MED–DATA, INC., Defendant.

No. CV–98–882–HU.

United States District Court,
D. Oregon.

May 16, 2000.

Victor Calzaretta, Portland, OR, for Plaintiff.

Alan K. Willert, Carter M. Mann, Foster Pepper & Shefelman LLP, Portland, OR, for Defendant.

## OPINION AND ORDER

HUBEL, United States Magistrate Judge.

Plaintiff Christine Halbasch brought this wrongful discharge action against her former employer, defendant Med–Data, Inc., alleging that defendant constructively discharged her because of her service as a juror in Clackamas County, Oregon. Plaintiff prevailed at trial when the jury found in her favor and awarded her $25,000 in noneconomic damages, $85,000 in economic damages, and $250,000 in punitive damages. Judgment was entered on January 7, 2000.

Defendant moves for a new trial under Federal Rule of Civil Procedure 59, and for relief from judgment under Federal Rule of Civil Procedure 60. Defendant also moves for remittitur of all the damages awards and argues that the punitive damages award violates due process under the Oregon and federal constitutions. Defendant also moves for a reduction of the punitive damages award under Oregon Revised Statute (ORS) 18.537(3).

## STANDARDS

I. Rule 59

■ The court may grant a new trial "for any of the reasons for which new trials have heretofore been granted[.]" Fed.R.Civ.P. 59. When, however, the new trial motion is based on insufficiency of the evidence, a "stringent standard" applies, and the motion will be granted only if the verdict "is against the great weight of the evidence or it is quite clear that the jury has reached a seriously erroneous result." *EEOC v. Pape Lift, Inc.*, 115 F.3d 676, 680 (9th Cir.1997) (internal quotation omitted).

Although the trial court may weigh the evidence and credibility of the witnesses, "the court is not justified in granting a new trial merely because it might have come to a different result from that reached by the jury." *Roy v. Volkswagen of Am., Inc.*, 896

F.2d 1174, 1176 (9th Cir.1990) (internal quotation omitted).

## II. Rule 60

■ A party may move for relief from judgment on the following grounds: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence; (3) fraud, misrepresentation, or other misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged; or (6) any other reason justifying relief from the operation of the judgment. Fed.R.Civ.P. 60(b). Here, defendant argues that plaintiff's counsel's misconduct justifies relief from judgment under Rule 60(b)(3).

> As recently explained by the Ninth Circuit: Rule 60(b)(3) permits a losing party to move for relief from judgment on the basis of "fraud, . . . misrepresentation, or other misconduct of an adverse party." Fed. R.Civ.P. 60(b)(3). To prevail, the moving party must prove by clear and convincing evidence that the verdict was obtained through fraud, misrepresentation, or other misconduct and the conduct complained of prevented the losing party from fully and fairly presenting the defense. . . . Rule 60(b)(3) "is aimed at judgments which were unfairly obtained, not at those which are factually incorrect." *In re M/V Peacock,* 809 F.2d 1403, 1405 (9th Cir.1987).

*DeSaracho v. Custom Food Mach., Inc.,* 206 F.3d 874, 880 (9th Cir.2000) (citations omitted).

## DISCUSSION

### I. Rule 59 and 60 Motions

#### A. Merits of Wrongful Discharge Claim

The jury was instructed that plaintiff had to prove, by a preponderance of the evidence, that (1) she served as a juror; (2) that she was discharged, either actually or constructively, because of her jury service; and (3) that she sustained damages. The jury was further instructed that to sustain her constructive discharge claim, plaintiff had to prove, by a preponderance of the evidence that (1) defendant intentionally created or intentionally maintained intolerable working conditions; (2) a reasonable person in plaintiff's position would have felt compelled to resign because of the working conditions; (3) defendant desired to cause plaintiff to leave her employment or was substantially certain she would leave due to the working conditions; and (4) plaintiff left defendant's employment because of the intolerable working conditions.

■ Defendant concedes that the jury was properly instructed. Nonetheless, defendant argues that the jury's verdict in plaintiff's favor is against the clear weight of the evidence. Defendant first argues that plaintiff failed to prove that her jury service was a "substantial, motivating factor" in defendant's employment decisions regarding plaintiff. Defendant notes that no witnesses other than plaintiff testified that plaintiff's working conditions changed because of her jury duty and that plaintiff herself testified only that "what else could it be?"

The evidence showed that until her jury service, plaintiff had been a problem-free employee. She had very favorable performance reviews, had been given substantially increased job responsibilities, and had received substantial increases in pay. Additionally, there was testimony that plaintiff's new supervisor called her at home in the evening during plaintiff's jury service and told her that her jury service was causing problems.

While defendant tried to show that the various changes in job conditions resulted from a manager change, a decision to bring plaintiff in line with company policy regarding compensatory time, and because her flextime schedule caused problems, the evidence as a whole allowed the jury to infer that the job condition changes resulted from plaintiff's jury service because nothing else of significance occurred in the relevant time period. Although the jury was not required to make that inference, it is not against the clear weight of the evidence.

■ Next, defendant argues that plaintiff failed to submit any evidence showing that the new working conditions were intolerable. Defendant contends that the only evidence

submitted on this issue was that (1) plaintiff was questioned about her commitment to the job; (2) plaintiff was brought in line with company policy on compensatory time and shift requirements; (3) plaintiff was excluded from meetings the subject of which she did not know; (4) plaintiff was offered her prior position, in fact a demotion, as an option; (5) plaintiff had her work unfairly criticized; and (6) plaintiff was told she would not be getting a raise that year as her salary was already too high for her level of experience compared to others similarly situated. Defendant argues that these changes do not amount to intolerable working conditions.

Plaintiff testified that her subordinates had their shifts and schedules changed without her knowledge, making it hard for her to perform her job. She testified that at the end of her jury service, Ila Carter, her new manager, expressed concerns about plaintiff's behavior and commitment. Plaintiff further testified that when she returned to work after jury duty, she was told that her pay raise did not look good, there would be no bonus, and that she could no longer work her flex schedule. She was also told that she could voluntarily demote herself to a lower position. Plaintiff testified that, upon returning to work after her jury service, she was excluded from client meetings, branch meetings, and coder meetings, and that she was excluded from physician contact. She also learned that, while she had her own office in the current over-crowded work space, upon moving to the new and larger quarters she would no longer have her own office.

Again, when the evidence is considered as a whole, the jury's verdict is not against the clear weight of the evidence. The various changes included some which a reasonable juror could find made it enormously difficult for plaintiff to perform her job. Added to that were changes in conditions, namely those regarding plaintiff's work space, her schedule, and her ability to accumulate compensatory time, that had up until that time greatly enhanced her work environment. Finally, there was to be no raise and no bonus. With this assessment of the proof, the jury's determination that the changes amounted to intolerable working conditions was not against the clear weight of the evidence.

Defendant next argues that there was no evidence showing that defendant intended that plaintiff resign or had a reasonable expectation that she would resign. Defendant contends that plaintiff offered no evidence to support this element of her claim.

Defendant fails to appreciate that plaintiff did not need to put on any direct evidence regarding this issue because inferences from the evidence in the record are sufficient to support the verdict. It is the rare case where there would be direct evidence of such intent. Given the evidence that defendant created intolerable working conditions and did so because of plaintiff's jury service, it was reasonable for the jury to infer that defendant intended to force plaintiff from her position.

Finally, defendant argues that the evidence of plaintiff's leaving her position because of the intolerable working conditions is not credible. Plaintiff's evidence at trial was that she resigned without telling defendants why, but that the reason was because of the change in working conditions. Defendant's witnesses testified that when she quit, plaintiff said she was leaving because she had another job starting the next work day. Defendant concedes that plaintiff testified that she left her job with defendant because of the change in working conditions but argues that this evidence is not credible because it came after plaintiff filed suit. Clearly, this is a classic jury question of which witnesses were the most credible on the issue. The verdict is not against the clear weight of the evidence.

## B. Punitive Damages

Defendant argues that there was no evidence to support a finding that it acted with malice or that it had shown a reckless and outrageous indifference to a highly unreasonable risk of harm and had acted with the conscious indifference to the health, safety, and welfare of others. Plaintiff contends that the malicious nature of defendant's conduct is evident because were it not for plaintiff serving on jury duty, she would not have

been subjected to the variety of acts that led to her ultimate forced resignation.

I agree with plaintiff. Even with a clear and convincing evidence standard, the jury could reasonably conclude that defendant's sole motive for its actions was to retaliate against plaintiff for her jury service commitment. By definition, any such motive is properly labeled as malicious.

### C. Misconduct

#### 1. Testimony of Stacie Tessman

As required in the Jury Trial Management Order, the parties submitted witness statements before the pretrial conference. Plaintiff submitted a witness statement for Stacie Tessman, a former employee of defendant, which indicated that Tessman would testify to plaintiff's job environment, particularly after plaintiff returned from jury service. Specifically, according to the statement, Tessman was to testify to plaintiff's exclusion from critical meetings, and the circumstances under which plaintiff lost privileges and conditions under which she had worked before her jury duty. At the pretrial conference, defendant objected to Tessman's proposed testimony because defendant believed that Tessman, who worked for defendant in Seattle, had no firsthand knowledge of plaintiff's work environment in Salem. Plaintiff responded that although Tessman was in Seattle, she had heard certain things about what was occurring in Salem and she would testify to admissions of defendant. I reserved ruling on defendant's objection and indicated that Tessman's testimony had to be based on her firsthand knowledge.

At trial, Tessman testified that she was aware of defendant's unwritten policy regarding jury service in which "[w]hen anybody got a jury summons, in our branch, our branch manager would write them a letter to get them out of jury duty." Tr. at p. 4 (Dkt.# 105). Her recollection was that this occurred several times.

At this point, defendant objected and the jury retired to the jury room. Out of the jury's presence, I heard a proffer of Tessman's testimony and argument from both counsel. Plaintiff argued that Tessman's testimony was based on firsthand knowledge and because it exposed a corporate policy, it fit within that portion of the witness statement indicating that Tessman would testify as to plaintiff's working conditions. I sustained defendant's objection, concluding that Tessman's testimony related only to the Seattle branch and was not indicative of a corporate policy, and thus, it was not testimony regarding plaintiff's working conditions in Salem. When the jury returned, I explained that I had sustained defendant's objection and that Tessman's testimony was stricken and not to be considered. Defendant declined my offer of a further curative jury instruction.

Defendant now argues that under Rule 60(b)(3), plaintiff's counsel's actions constitute misconduct. Defendant argues that despite its attempts to have the issue decided before trial, plaintiff's counsel put Tessman on the stand knowing she would testify to things not disclosed and about which she lacked firsthand knowledge.

I do not find clear and convincing evidence supporting the misconduct allegation. Tessman did have firsthand knowledge of what occurred in Seattle and her testimony complied with my instructions in that regard. While I ultimately rejected plaintiff's argument that the testimony was adequately disclosed in the pretrial witness statement because it concerned plaintiff's working conditions, plaintiff's argument was plausible, was worthy of consideration, and was not unreasonable. Additionally, given my instruction to the jury to disregard the testimony, defendant was not prevented from fully and fairly presenting its defense.

#### 2. Washington Administrative Law Judge Decision

LuAnn Renfrow is defendant's chief operating officer and executive vice president. During her testimony, Renfrow denied that the company culture was one where employees were "blackballed" if they made an internal complaint. Tr. at p. 75. She denied that it was a "don't rock the boat" culture. *Id.* Plaintiff's counsel then asked

Renfrow if it were true that a Washington governmental agency had found that defendant had an internal complaint procedure that was obstructive and that employees would be picked on if they used it. *Id.* at p. 79. Included within that question, plaintiff's counsel also asked if it were true that the agency had found that defendant discriminated against employees and refused to pay overtime. Before Renfrow could answer the question, defendant objected.

I sent the jury out and heard plaintiff's offer of proof which included the offer of Exhibit 49, a decision by a Washington Administrative Law Judge concerning an unemployment compensation claim made by a former employee of defendant's. After argument by both counsel, I sustained defendant's objection to plaintiff's question and concluded that plaintiff could not use Exhibit 49 unless Renfrow denied, in response to a rephrased question, that there had been allegations that defendant's internal complaint policy was a sham and that there was a "don't rock the boat" corporate culture.

When the jury returned, I informed them that defendant's objection to plaintiff's last question was sustained and that plaintiff was allowed to rephrase the question. Plaintiff then asked Renfrow if it were true that "there were complaints, from employees, that the complaint procedure was a sham, and that there would be retaliation for using the procedure[.]" Tr. at p. 125. Renfrow admitted that she was aware of one such complaint. Exhibit 49 was never admitted or used before the jury.

Defendant argues that as a result of the question first posed to Renfrow regarding what a "Washington governmental agency found," the jury was unfairly prejudiced by learning about a document that they should not have heard about. Defendant argues that because plaintiff knew this was not an impeachment document, plaintiff's counsel committed misconduct by failing to disclose the document before trial so its admissibility could be determined at the pretrial conference.

Plaintiff responds that until Renfrow conceded, after the offer of proof which included Exhibit 49, that there were allegations of a sham internal complaint procedure and a "don't rock the boat" atmosphere, it was apparent that she was going to deny that the complaint procedure was a sham and that there was a "don't rock the boat" culture. Renfrow did in fact make such denials in her testimony. Thus, according to plaintiff, the document, and the question leading up to its introduction, was properly considered impeachment.

I agree with plaintiff. First, the transcript reveals that the jury was never informed of a document. The question heard by the jury simply mentioned a Washington governmental agency finding. There was no reference to the context in which the finding occurred or whether it was in writing. The critical portion of the question, and Exhibit 49, concerned the internal complaint policy, specifically that its use was discouraged and there was a "don't rock the boat atmosphere" at the company. Renfrow denied that there was such an atmosphere. Plaintiff's attempts to impeach Renfrow on that issue were proper. The jury was informed that defendant's objection was sustained and plaintiff rephrased the question. There was no misconduct.

3. Testimony of Plaintiff's Parents, Sister, and Officer Gallucci

■ Plaintiff's parents and sister, and Officer Gallucci, whom plaintiff met while serving on jury duty, all testified to plaintiff's mood and affect either during or after her jury service. During the pretrial conference, I ruled that these witnesses were prevented from testifying as to the cause of plaintiff's emotional distress and that they were to testify only to the fact of her distress based on their personal observations. Defendant argues that each one of these witnesses violated my ruling. Defendant contends that this is evidence of plaintiff's counsel's misconduct in failing to properly instruct plaintiff's witnesses.

Defendant's argument is unsupported conjecture. A reasonable inference is that the witnesses had difficulty incorporating my ruling into their testimony. It is hard enough for persons trained in the law to implement a

court's rulings. It is even harder for a lay witness, who is most likely anxious while testifying in a trial, to follow the court's instructions, especially in this regard when the ruling required the witnesses to pare what they likely considered relevant information, from their previously prepared testimony. There is no clear and convincing evidence of misconduct. Furthermore, because I struck any inappropriate testimony that came in, defendant was not prevented from fully and fairly presenting its defense.

### 4. Stephanie Tigner's Testimony

Plaintiff called Stephanie Tigner as an impeachment witness. As a result, she was not disclosed to defendant before trial. Defendant argues that Tigner's testimony was, at best, rebuttal evidence and that plaintiff's counsel's failure to disclose Tigner as a witness before trial was misconduct because her testimony was not true impeachment.

Tigner formerly worked for defendant as its personnel/payroll clerk. She handled all personnel and payroll functions for the entire company from November 1995 until April 1998. Tigner testified that it was common practice for defendant to offer compensatory time to its employees and that Renfrow knew this because her secretary had taken compensatory time off on a number of occasions.

Tigner also testified that defendant's policy regarding employee jury duty summonses was to write a letter to excuse the employee from jury duty by stating that it would be hardship to the company. Tigner described a further unwritten policy of defendant reminding the employee that it paid the employee's wages for two weeks of jury service and that if the service went beyond that amount of time, "it would come out of their personal time[.]" Tr. at p. 130. According to Tigner, defendant's objective was to discourage jury duty service. Tigner explained that Renfrow knew about defendant's jury duty policies for three reasons. First, Tigner testified that nothing happened in the company without Renfrow knowing about it. Second, Tigner had written a letter for Renfrow's signature to excuse an employee from jury duty. Third, all of the managers reported to Renfrow regarding each branch and

Tigner had written jury duty excuse letters for those managers on a number of occasions.

Renfrow had previously testified that there was no compensatory time at the company. She noted that if employees used that term, she explained to them that defendant did not have compensatory time. She stated that employees who worked overtime were not entitled to compensatory time because exempt, salaried employees were expected to do the job that needed to be done. She acknowledged that employees may be given a day off with pay for a job well done.

Renfrow also testified that the company's policy toward jury duty service was that the employee should do the jury duty unless there was a compelling personal or business reason not to. If there was such a business reason, defendant may ask the employee to defer jury duty. She testified that there were no repercussions taken against employees who performed their jury duty service. Renfrow also denied that defendant used its policy of paying regular wages only for the first two weeks of jury duty to coerce employees to refrain from jury service.

The applicable federal rule requires the pretrial disclosure of witnesses that a party may call at trial, "other than solely for impeachment purposes[.]" Fed.R.Civ.P. 26(a)(3). Defendant relies on a 1998 First Circuit case in which the court held that documents which were both substantive evidence as well as impeachment, should have been disclosed before trial and that counsel's failure to disclose constituted misconduct under Rule 60, resulting in a new trial. *Klonoski v. Mahlab*, 156 F.3d 255, 270, 274–76 (1st Cir.1998), *cert. denied*, 526 U.S. 1039, 119 S.Ct. 1334, 143 L.Ed.2d 498 (1999). There, the court, quoting from a Fifth Circuit case, held that substantive evidence is " 'that which is offered to establish the truth of a matter to be determined by the trier of fact.' " *Id.* at 270 (quoting *Chiasson v. Zapata Gulf Marine Corp.*, 988 F.2d 513, 517 (5th Cir.1993)). In contrast, impeachment evidence is " 'that which is offered to discredit a witness to reduce the effectiveness of [the witness's] testimony by bringing forth evidence which explains why the jury should not put faith in [the witness's] testimony.' " *Id.*

(quoting *Id.*) (other internal quotations omitted). In *Klonoski*, the court determined that the documents at issue were at least in part substantive and thus, did not fall within the "solely for impeachment" exception of Rule 26(a)(3). Because the trial court's admission of the letters was not harmless error, the *Klonoski* court ordered a new trial.

▮ Defendant argues that Tigner's testimony was at least partially substantive in that it not only discredited Renfrow's testimony on the issues of compensatory time and defendant's policy toward jury duty, but also tended to establish the truth of plaintiff's allegations regarding those issues—that use of compensatory time was prevalent and that defendant's policy toward jury service was to discourage it. Defendant maintains that, given the nature of the testimony, its admission was not harmless and plaintiff's counsel's failure to disclose Tigner as a witness before trial was misconduct under Rule 60 requiring, in this situation, a new trial.

While *Klonoski* is controlling in the First Circuit, it is not here. I have been unable to find, and the parties have not cited, any Ninth Circuit authority on point. It appears that not all courts take the same restrictive view of the word "solely" in Rule 26(a)(3), as does the First Circuit.

For example, in *DeBiasio v. Illinois Cent. R.R.*, 52 F.3d 678 (7th Cir.1995), a case involving claims under the Federal Employers' Liability Act and the Federal Safety Appliance Act, the defendant railroad called a witness who had not been named in the pretrial disclosures, but who had been qualified as an expert during pretrial depositions. On direct examination, the railroad's counsel asked the witness to authenticate an exhibit which would have impeached the testimony of one of plaintiff's witnesses. The plaintiff objected on the basis that the defendant had not disclosed either the witness or the exhibit as required by Rule 26(a)(2). The defendant argued that insofar as the witness was just authenticating the exhibit, he was merely an impeachment witness. The trial court sustained the plaintiff's objection to testimony about the exhibit, but allowed the defendant's witness to testify as an expert. The Seventh Circuit found that the trial court had erred in excluding the impeachment testimony. *Id.* at 686. In so ruling, the court suggested that it is an abuse of discretion to exclude evidence that is offered for impeachment purposes, even if that same evidence has substantive value as well. *See id.*

In an unpublished 1997 decision, the Fourth Circuit upheld the trial court's admission of certain impeachment evidence which also went directly to the substance of the allegations of the plaintiff's case in chief. *Jeffries v. Pacific Indemnity Co.*, No. 97–1395, 1997 WL 774459 (4th Cir. Dec. 17, 1997) (unpublished). There, the plaintiff sought recovery from her insurance company for insured jewelry that had been lost or stolen. As part of her claim, the plaintiff had to demonstrate that she owned all of the jewelry at issue. She relied on her own testimony in support of her claimed ownership. The defendant then introduced three exhibits, none previously disclosed, showing that the plaintiff did not own some of the items of jewelry on the date of loss. Even though such evidence clearly challenged the substance of the plaintiff's claim, the Fourth Circuit concluded that the exhibits were used to impeach the plaintiff's credibility and that it was not error to admit them without prior disclosure to the plaintiff.

Without controlling Ninth Circuit authority, I am unwilling to apply *Klonoski* to the facts presented here. It is unclear from the cases whether "solely" applies to the use subjectively intended by the offering party, or instead, to any possible use that may later be ascertained by the opposing party or a court. In other words, if a party truly offers evidence "solely" for impeachment purposes, but the evidence carries some substantive purpose because of its nature, some courts, like the First Circuit, may conclude that it must be disclosed pretrial under Rule 26(a)(3). Other courts, like the Seventh and Fourth Circuits, may attach more significance to the offering party's intent and designation, regardless of the coexistence of a substantive element.

I am concerned that the First Circuit's approach would result in an erosion of evidence capable of warranting the impeachment designation. It is the rare case where

an attack on a witness's credibility cannot be linked to some substantive element of a claim. Under *Klonoski*, admission of evidence offered "solely" to impeach would likely be erroneous in almost every case. It is doubtful Congress intended the "solely" exception to swallow the entire impeachment rule.

Under the facts of the instant case, Tigner's testimony was offered to impeach Renfrow even though it can be characterized as relevant to substantive issues in the case. Because it was offered solely to impeach Renfrow, it was not misconduct to fail to disclose Tigner before trial.

## II. Remittitur

Where an award of damages is "grossly excessive or monstrous, clearly not supported by the evidence, or only based on speculation or guesswork," *Los Angeles Memorial Coliseum Comm'n v. National Football League*, 791 F.2d 1356, 1360 (9th Cir.1986), and gives rise to an inference that "passion and prejudice" tainted the jury's finding of liability, a new trial may be in order. *See, e.g. Seymour v. Summa Vista Cinema, Inc.*, 809 F.2d 1385, 1387 (9th Cir.1987). As we have made clear, however, "[w]here there is no evidence that passion and prejudice affected the liability finding, remittitur is an appropriate method of reducing an excessive verdict." *Seymour*, 809 F.2d at 1387.

*Snyder v. Freight, Constr., Gen'l Drivers, Warehousemen and Helpers, Local No. 287*, 175 F.3d 680, 689 (9th Cir.), *cert. denied*, —— U.S. ——, 120 S.Ct. 403, 145 L.Ed.2d 314 (1999).

### A. Noneconomic and Economic Damages

■ Defendant argues that the awards of $85,000 in economic damages and $25,000 in noneconomic damages are against the clear weight of the evidence and should be subjected to remittitur. As to plaintiff's economic damages, defendant contends that plaintiff was awarded an amount equal to almost three times her annual pay with defendant and which would include two years of front pay, despite the lack of any credible evidence that she will remain unemployed for more

than a few months. I reject this argument. As plaintiff notes, the jury was entitled to consider plaintiff's damages such as loss of retirement, medical insurance, and other benefits as well as her backpay. The jury was instructed that plaintiff was obligated to mitigate her damages. Plaintiff's testimony was that she earned more per year with defendant than in her subsequent job working for her parents and that she was unemployed at the time of trial. The jury's verdict is not against the clear weight of the evidence.

■ Defendant argues that the noneconomic damages award was against the clear weight of the evidence. Defendant argues that all of the testimony regarding plaintiff's depression was contradicted by plaintiff's own medical records which showed that she suffered from a longstanding depression which was improving after the conclusion of her employment with defendant. Defendant contends that no reasonable juror would disregard the medical records in favor of the self-serving testimony of plaintiff and her family members.

The testimony established that plaintiff's emotional distress over defendant's actions encompassed more than depression. Witnesses indicated that plaintiff suffered from sleep disturbances, loss of appetite, bouts of crying, and anger. Others described her as tired and withdrawn. While depression was certainly a significant component of her damages claim, it was not the only basis for it. Additionally, while plaintiff's medical records showed that she had a long history of depression that was improving, it does not negate her testimony that the incident with defendant depressed her. It is possible that she may have shown more dramatic improvement or earlier improvement without having experienced defendant's actions.

This is another classic situation of conflicting evidence. It was within the jury's province to resolve this conflict, according each piece of evidence the weight it deemed appropriate. The jury credited the testimony over the records. I cannot say it was unreasonable to do so.

## B. Punitive Damages

Defendant argues that the punitive damages award violates federal due process standards and that it is excessive as a matter of Oregon substantive law.

### 1. Federal Due Process

"Punitive damages may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition." *BMW of N. Am. v. Gore,* 517 U.S. 559, 568, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). "Only when an award can fairly be categorized as 'grossly excessive' in relation to these interests does it enter the zone of arbitrariness that violates the Due Process Clause of the Fourteenth Amendment." *Id.*

In *BMW,* the Supreme Court established three standards for measuring whether a punitive damages award is unreasonable and "grossly excessive" in relation to the state's legitimate goals. "Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *Id.* at 575, 116 S.Ct. 1589.

"The second and perhaps most commonly cited indicium of an unreasonable or excessive punitive damages award is its ratio to the actual harm inflicted on the plaintiff." *Id.* at 580, 116 S.Ct. 1589. "[E]xemplary damages must bear a 'reasonable relationship' to compensatory damages[.]" *Id.* The third standard is "[c]omparing the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct[.]" *Id.* at 582, 116 S.Ct. 1589.

Defendant argues that the punitive damages award in this case violates due process under *BMW.* First, defendant argues that its conduct was not reprehensible. It notes that there was no allegation that plaintiff was assaulted, threatened, harassed, touched, insulted, humiliated, fired, demoted, or ridiculed. Additionally, defendant states that there was no evidence that it engaged in repeated instances of such misconduct.

Plaintiff argues that there was evidence from which a reasonable jury could have determined that defendant's conduct was reprehensible because its acts included calling plaintiff at home at night during her jury service, telling her that jury service was causing problems, questioning her productivity from several years earlier, excluding her from meetings, and changing, or potentially changing, several conditions of her employment. Plaintiff further argues that defendant's conduct represents an interference with the American justice system which in and of itself is reprehensible.

While defendant's conduct did not include any physical assault on plaintiff or any overtly humiliating acts, the evidence is capable of sustaining a finding that defendant acted reprehensibly. By retaliating against plaintiff for her insistence in complying with a summons from a state court to serve as a juror, defendant's acts compromised a basic tenet of the justice system in this country. Actions such as the jury found occurred here, could have a profound impact on society and are appropriately considered reprehensible.

Next, defendant acknowledges that the punitive damages award is slightly more than twice the compensatory damages award. But, defendant argues, the award is unreasonable given the scant evidence of actual harm to plaintiff and the lack of reprehensibility of defendant's conduct.

Plaintiff argues, and I agree, that in looking at the relationship between compensatory and punitive damages, there is nothing to suggest that the punitive award was excessive. I have already determined that the compensatory damages award and a finding of reprehensible conduct is supported by the evidence. Given that, the ratio is entirely reasonable.

The third *BMW* factor requires the court to compare the award to other criminal or civil penalties regulating the conduct at issue. Under ORS 10.992, the civil penalty for violating ORS 10.090, which prohibits employers from retaliating against employees because of their jury service, is $500. There are no criminal sanctions. Defendant notes that because the punitive damages award is 250 times greater than the largest monetary penalty that the Oregon Legislature has seen fit to impose for the conduct with which defendant was charged, the ratio is far greater

than those where other courts have found to be unreasonable and excessive.

I agree that the civil penalty to punitive damages ratio could suggest that the punitive damages award is excessive. However, it is merely one factor and it is not dispositive. Furthermore, the de minimus statutory civil penalty here has already been found wanting by this Court in the earlier Opinion rejecting it as an adequate remedy so as to preclude a wrongful discharge claim. Because the other factors indicate that the punitive damages award was not grossly excessive, it should not be reduced.

Defendant also argues that in addition to the three *BMW* factors, at least two other factors considered by the Supreme Court in *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991), suggest that remittitur is appropriate. First, defendant argues that financial profit could hardly have motivated it to constructively discharge plaintiff because the evidence was that at the time plaintiff quit, defendant was short-handed and could not afford to lose an employee with plaintiff's coding experience. Defendant neglects to note that the evidence can support a conclusion that its discouragement of jury service was financially motivated.

Defendant also argues that the punitive damages award is grossly excessive in relation to defendant's financial condition. The financial statements admitted in evidence show that in 1998, the year plaintiff ceased working for defendant, defendant's net profit was only $278,000. Thus, defendant argues, the punitive damages award is excessive because it is nearly equal to one year's annual profit.

Defendant fails to mention that the financial statements show that in 1998, defendant had $1,143,253 in current assets with total assets equaling $1,758,971. Additionally, the company generated revenues of over $8,000,-000 in 1997 and over $9,500,000 in 1998. These figures are equally relevant to defendant's net profit in assessing the reasonableness of the punitive award.

Finally, defendant argues that the nature of the plaintiff's claims created a greater than usual danger that the jury would be improperly swayed by emotion and prejudice rather than a reasoned weighing of the evidence and the court's instructions. Defendant argues that plaintiff's closing argument, "with its unrepentant flag-waving that seemed specifically designed to appeal to the jurors' emotions," exacerbated the problem. Defendant argues that the jury's verdict was tainted by emotion and prejudice.

I conclude that the punitive damages award does not violate due process and, because there is evidence to support the award, emotion or prejudice does not provide a basis upon which to set it aside.

2. Oregon Law

In Oregon, the trial court is required to review the award to determine whether the award is within the range of damages that a rational juror would be entitled to award based on the record as a whole, viewing the statutory and common-law factors that allow an award of punitive damages for the specific type of claim at issue in the proceeding.

ORS 18.537(2).[1] This standard represents a codification of principles announced in *Oberg v. Honda Motor Co.*, 320 Or. 544, 888 P.2d 8 (1995). *See Parrott v. Carr Chevrolet, Inc.*, 156 Or.App. 257, 274 n. 16, 965 P.2d 440, 450 (1998) (citing language from *Oberg* and noting that the *Oberg* standard was incorporated into ORS 18.535 to 18.540), *rev. allowed*, 328 Or. 418, 987 P.2d 511 (1999). The purpose of the *Oberg* standard was to "provide judicial review of punitive damage awards in order to assure that they are not excessive in violation of the Due Process Clause of the federal constitution." *MacCrone v. Edwards Ctr., Inc.*, 160 Or.App. 91, 105, 980 P.2d 1156, 1164 (1999).

Cases decided by Oregon's appellate courts after *Oberg*, but before the effective date of ORS 18.537(2), have held that the Supreme Court's decision in *BMW* "altered the limited role of the reviewing court under the *Oberg*

---

1. Neither side has raised the issue of whether ORS 18.537 is applicable in a diversity case in federal court. I assume, without deciding, that it is.

standard[.]" *MacCrone,* 160 Or.App. at 106, 980 P.2d at 1164 (citing *BMW,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809, *Blume v. Fred Meyer, Inc.,* 155 Or.App. 102, 113, 963 P.2d 700, 706 (1998)).. Thus, as explained in *MacCrone:*

> when a party assigns error in this court to a trial court's reduction of a jury's punitive damage award, we will make an independent assessment of the jury's award to determine whether it is constitutionally excessive in violation of due process under the *BMW* guideposts without regard to the trial court's reasoning.

*Id.*

Defendant notes that Oregon courts have analyzed the reasonableness of punitive damage awards using the *BMW* criteria. and that the criteria in ORS 18.537(2) are reflected in the *BMW* analysis. Thus, according to defendant, because the award is constitutionally defective under *BMW* for the purposes of federal constitutional law, it is also unconstitutionally excessive under Oregon law.

The issue defendant misses, however, is that the relevant Oregon cases, e.g. *Oberg, MacCrone,* and *Blume,* have all addressed whether a punitive damages award was excessive in relation to the Due Process Clause of the Fourteenth Amendment—a question of *federal,* not state, law. In Oregon, there is no state constitutional due process counterpart. *See, e.g., State v. Wagner,* 305 Or. 115, 145–46, 752 P.2d 1136, 1155 (1988) (rejecting the invitation to construe Article I, section 10 of the Oregon Constitution, which guarantees injured persons a remedy in due course of law, as a due process clause), *vacated on other grounds,* 492 U.S. 914, 109 S.Ct. 3235, 106 L.Ed.2d 583 (1989); *State v. Hart,* 299 Or. 128, 140, 699 P.2d 1113, 1120 (1985) (Article I, section 10, of the Oregon Constitution is not a "due process" clause); *State ex rel. Jones v. Crookham,* 296 Or. 735, 742, 681 P.2d 103, 108 (1984) (Linde, J., concurring) (because Oregon does not have a due process clause in its state constitution, Oregon Rule of Civil Procedure 4L means, in practice, that an Oregon court has jurisdiction to the limits of due process under the Fourteenth Amendment and those limits are "an issue of federal law to be decided pursuant to the controlling decisions of the United States Supreme Court").

Therefore, defendant fails to identify an appropriate independent state constitutional basis·for its challenge to the punitive damages award. To the extent that defendant's challenge is brought under ORS 18.537(2), I reject defendant's argument for the following reasons.

As noted above, ORS 18.537(2) is a codification of the *Oberg* standard and both *BMW* and *Oberg* "relate to statutory and common-law factors." *Blume,* 155 Or.App. at 113, 963 P.2d at 706. Therefore, because *BMW* and ORS 18.537(2) are similar vehicles for determining the reasonableness of a punitive damages award, an application of the *BMW* factors can substitute for an excessive analysis under ORS 18.537(2). Based on the previous section's discussion of the *BMW* factors as they apply to this case, I conclude that the punitive damages award is not excessive under ORS 18.537(2).

## III. ORS 18.537(3)

Oregon law allows for the reduction of a punitive damages award based on subsequent remedial measures undertaken by a defendant. The statute provides:

> In addition to any reduction that may be made under subsection (2) of this section, upon the motion of a defendant the court may reduce the amount of any judgment requiring the payment of punitive damages entered against the defendant if the defendant establishes that the defendant has taken remedial measures that are reasonable under the circumstances to prevent reoccurrence of the conduct that gave rise to the claim for punitive damages. In reducing awards of punitive damages under the provisions of this subsection, the court shall consider the amount of any previous judgment for punitive damages entered against the same defendant for the same conduct giving rise to a claim for punitive damages.

ORS 18.537(3).

Defendant submits the declaration of defense counsel who states that defendant has taken the following remedial measures, fol-

lowing the filing of the lawsuit but prior to trial:

(1) All branch managers and other supervisory personnel have been advised of the issues involved in this suit and advised of the proper procedures regarding jury duty and any request to defer jury duty;

(2) It has been made clear that no one is to suffer adverse consequences by virtue of responding to a summons for jury duty and that any associate wishing to perform jury duty service has an absolute right to do so.

(3) All associates have been regularly advised of defendant's open door policy.

(4) Counsel has been instructed to review and revise defendant's Associate Handbook to correct any errors contained therein and to spell out the absolute right of associates to serve on jury duty if they so desire.

(5) Counsel has also been instructed to ensure that the jury duty policy is "more than just legal, but fair to associates if that exceeds the legal requirements."

(6) Counsel has been instructed to ensure that the handbook provides associates with a "valid, legitimate, and respected" outlet for any concerns they may wish to raise, on this issue or any other.

(7) All branch managers and corporate personnel have been advised of the company's policy on compensatory time and how time off is to be granted in extraordinary cases to reward extraordinary effort, but that compensatory time is not permitted.

(8) Defendant has hired human resource personnel to administer and oversee the human resource department and to ensure that defendant is in compliance with not only what is required by law, but to strive to exceed the legal requirements in order to do what is fair.

Defense counsel states in his declaration that these measures have either been implemented or, in the case of the handbook review, are in the process of being implemented. He further states that defendant has taken every reasonable step to insure that this situation will not arise again.

The statute was enacted in 1995. I find no Oregon cases interpreting it and the parties have supplied none. Before turning to the merits of the argument, I note that defense counsel's declaration is an insufficient basis upon which to make any reduction under ORS 15.537(3). Initially, it is not an affidavit or declaration of defendant, although this defect could most likely be easily remedied. More importantly, at this point, there has been no opportunity for plaintiff to contest the facts asserted in the declaration. The statute requires defendant to "establish" the measures taken. While it is unclear whether the Oregon Legislature envisioned a post-trial factfinding hearing on subsequent remedial measures or additional post-trial discovery on this issue, it would certainly violate traditional notions of fairness to accept at face value the self-serving assertions, sworn or unsworn, of a party seeking a reduction in damages awarded by a jury without giving the opposing party the opportunity to at least conduct some limited discovery.

While the issue of what truth-testing processes apply to a motion for reduction brought under ORS 18.537(3) is an important one, I need not resolve it here because I conclude that ORS 18.537(3), as applied to a common law claim of wrongful discharge, violates the Oregon Constitution.

In a 1999 case challenging the constitutionality of the legislature's imposition of a $500,000 cap on noneconomic damages in ORS 18.560(1), the Oregon Supreme Court held that Article I, section 17 of the Oregon Constitution [2] "prohibits the legislature from interfering with the full effect of a jury's assessment of noneconomic damages, at least as to civil cases in which the right to jury trial was customary in 1857, or in cases of like nature." *Lakin v. Senco Prods., Inc.,* 329 Or. 62, 78, 987 P.2d 463, 473, *modified,* 329 Or. 369, 987 P.2d 476 (1999). The court initially determined that the assessment of damages "was a function of a common law jury in 1857[,]" when the Oregon Constitution was adopted. *Id.* at 74, 987 P.2d at 470. Next, the court noted that although, in 1857, a trial court had the authority to reduce a

---

**2.** "In all civil cases the right of Trial by Jury shall remain inviolate." Or. Const. Art. I, § 17.

verdict it considered excessive, it could do so only after giving the prevailing party the option of a new trial.[3]  *Id.* at 75, 987 P.2d at 471.  The causes of action in *Lakin* included negligence and loss of consortium.  Thus, they had "common-law origins" which imbued them with the protection of Article I, section 17, and the application of ORS 18.560(1) to such claims was unconstitutional.[4]

The common law claim of wrongful discharge was not recognized in Oregon until 1975 when the Oregon Supreme Court decided *Nees v. Hocks*, 272 Or. 210, 536 P.2d 512 (1975).  Obviously, the claim was not recognized at common law when the Oregon Constitution was enacted.  I conclude, however, that a wrongful discharge claim is "of like nature" to those common law claims in existence in 1857.  I need not determine whether a wrongful discharge claim is more like a personal injury action in the context of an employment relationship, or is more like a breach of contract action, because both were common law actions which were afforded jury trials in 1857.  *See, e.g., Greist*, 322 Or. at 294, 906 P.2d at 797 (right to jury trial existed for personal injury actions in 1857); *Molodyh v. Truck Ins. Exchange*, 304 Or. 290, 295–98, 744 P.2d 992, 995–96 (1987) (ac-

tions on contract afforded right to jury trial when Oregon Constitution adopted).

Under *Lakin*, it is clear that a statutory cap on damages violates Article I, section 17.  ORS 18.537(3) is not a statutory cap.  Nonetheless, I conclude that it is unconstitutional in this case.

What most readily distinguishes ORS 18.537(3) from a statutory cap is that the reduction allowed by ORS 18.537(3) is discretionary, not mandatory.  *See Lakin*, 329 Or. at 77, 987 P.2d at 472 (noting that statutory cap is mandatory).  Setting that difference aside, there are two similarities between ORS 18.537(3) and ORS 18.560(1) which convince me that ORS 18.537(3) is unconstitutional.

First, like the statutory cap, the reduction allowed by ORS 18.537(3) is not related to a finding of excessiveness.  Rather, the statute states that "[i]n addition to any reduction that *may* be made under [that portion of the statute setting standards for evaluating whether a verdict is excessive], ... the court may reduce ..." ORS 18.537(3) (emphasis added).  Second, and most importantly, like the statutory cap, there is no opportunity for the prevailing party to choose a new trial over a reduction in the award.  As the *Lakin* court noted, in 1857, the power afforded to Oregon's trial judges to reduce excessive ver-

---

**3.**  In 1910, however, "Oregon voters eliminated Oregon trial courts' power to grant new trials for excessive verdicts by adopting Article VII (Amended), section 3[.]" *Id.* at 76, 987 P.2d at 471.

**4.**  The *Lakin* court distinguished an earlier case, *Greist v. Phillips*, 322 Or. 281, 906 P.2d 789 (1995), which upheld the same damages cap in ORS 18.560(1) as applied to statutory causes of action.  *Greist* involved a wrongful death claim which was created by the 1862 Deady Code, after the enactment of the Oregon Constitution.  From 1862 until 1967, the wrongful death statute included a cap on damages.  Because *Greist* involved a non-common law claim, and because of its history of carrying a cap, the court held that there was no violation of Article I, section 17 because there was no right to a jury's assessment of damages for such a claim when the Oregon Constitution was enacted.  *Id.* at 294, 906 P.2d at 797.

The plaintiff in *Greist* also argued, however, that a wrongful death claim was "of like nature" to a common law personal injury action and thus, Article I, section 17 should apply to protect the jury's determination from the legislative cap.

*Id.* The court, assuming that a wrongful death action was indeed "of like nature" to other common-law claims in existence in 1857, nonetheless rejected that argument because, it concluded, Oregon trial courts were empowered to set aside excessive jury verdicts at the time Article I, section 17 was enacted.  *Id.*

The defendant in *Lakin* relied on this language from *Greist* to argue that ORS 18.560(1) was not unconstitutional, even as applied to common-law claims.  The *Lakin* court indicated that the language in *Greist* was dicta that needed "correcting" in that the power accorded to Oregon trial courts to reduce excessive verdicts was limited by the prevailing party's choice of demanding a new trial or accepting the remitted verdict.  *Lakin*, 329 Or. at 76, 987 P.2d at 472.

I do not agree with the *Lakin* court's characterization of the language in *Greist* as dicta.  It appears to be a holding of the case, not discourse unnecessary for decision.  Nonetheless, I follow *Lakin* in the instant case because *Lakin* 's expression of the law is clear and unequivocal and because the cause of action in *Lakin* more closely approximates the type of claim at issue here.

dicts was in conjunction with the prevailing party's right to choose between a new trial and accepting a lower damages award. Because the reduction allowed by ORS 18.537(3) does not afford a prevailing party that opportunity, it violates Article I, section 17.

In sum, assuming defendant could "establish" its subsequent remedial measures, I reject defendant's argument that those remedial measures justify a reduction in the punitive damages award under ORS 18.537(3). ORS 18.537(3) is unconstitutional.

## CONCLUSION

Defendant's motions for new trial (# 95–1), motion for relief from judgment (# 95–2), and motion for remittitur (# 95–3), are denied.

IT IS SO ORDERED.