Aprill CAMPBELL, Plaintiff,

v.

SAFEWAY, INC., a Delaware corporation, Defendant.

Civil No. 03–324–MO.

United States District Court,
D. Oregon.

Aug. 25, 2004.

1368

Gene Barry Mechanic, Goldberg Mechanic Stuart & Gibson LLP, Portland, OR, for Plaintiff.

Amy Kathleen Brenner, Barran Liebman, LLP, Lisa C. Brown, Portland, OR, for Defendant.

### ORDER and OPINION

MOSMAN, District Judge.

Defendant Safeway, Inc. accused plaintiff Aprill Campbell, a former Safeway employee, of stealing $800 from its cash registers. While plaintiff signed a confession admitting she took the money, she contends she did not steal any money and Safeway's security guard obtained the confession under duress. Plaintiff brings two state law claims against defendant Safeway, one for false imprisonment and the other for intentional infliction of emotional distress. Defendant moves for summary judgment against both claims. Because issues of material fact exist, the court DENIES defendant's motion for summary judgment. (Doc. # 77).

## I. BACKGROUND

The facts, read in favor of nonmovant plaintiff, are as follows. Plaintiff worked at the Springfield, Oregon Safeway store from September 1999 until March 2001. On February 22, 2001, plaintiff worked the night shift as a cashier and person in charge, or "PIC." While Campbell was the last cashier to leave the store that night, other cashiers aside from plaintiff worked at her registers.

The next morning, the store's morning-shift bookkeeper discovered that some money was missing since Paula Frazer, the evening-shift bookkeeper, had last audited the registers the night before. As a result, the bookkeepers and Amanda Carter, the store manager, initiated an investigation. Defendant claims the documents Frazer reviewed showed about $800 was missing; plaintiff, in contrast, argues the documents do not show that $800 was missing.

During the investigation, store personnel discovered that three twenty-dollar bills, which had been placed under the pan in plaintiff's register the night before, were missing. Plaintiff's register's tape showed the three bills had not been paid out to customers. Carter also personally reviewed all the transactions from the night before and concluded the three bills had not been paid out to customers. Plaintiff, therefore, became a suspect.

Almost two weeks later, on March 5, 2001, Carter called plaintiff into her office so store security personnel could interview her. Plaintiff did not know why she was called into the office until after Carter closed the office door behind them. Dave Curtis, a Safeway security guard, conducted the interview. During the interview, the parties were arranged thusly: security guard Curtis sat behind the desk facing two chairs. Plaintiff sat in one of the chairs while Carter sat in the other chair which was situated behind plaintiff's chair and near the door.

When plaintiff realized Curtis believed she had stolen from the store, she turned longingly to look at the door. At which point, Carter shuffled her chair directly in front of the door, blocking the office's only exit.

In response to Curtis's initial questions regarding whether plaintiff had acted in such a way as to affect adversely Safeway's assets, plaintiff insisted she did not know what Curtis was talking about or what he wanted to hear. When it became

abundantly clear Curtis was accusing plaintiff of theft, she repeatedly denied the allegation. While plaintiff concedes Curtis never yelled at her, she describes Curtis's tone as harsh and aggressive. Indeed, at one point, in response to plaintiff's denials of wrongdoing, Curtis warned her if she did not lose her "cocky attitude," he was "going to take her outside and kick her ass." Curtis further suggested to plaintiff that if she denied knowing anything she would go to jail, because he is not one "to waste time." He also explained to plaintiff, at least twice, that when an employee accused of theft asks to "see proof" that employee is "automatically taken to jail." As further warning, Curtis told plaintiff he had never been sued, so she should not "even consider" suing him.

Exasperated, plaintiff finally asked Curtis, "What do you want me to say?" Curtis responded that if she would sign a confession she would not be taken to jail, everything would be handled internally, and she would be able to get home to see her children. Plaintiff, therefore, agreed to sign a confession, which Curtis dictated to her. Curtis asked plaintiff how much the confession should state she took; plaintiff responded, "I don't know, $20, let's say $20, I just want to go home." Curtis told plaintiff "to get real" and ultimately settled on a much higher figure; the confession, in pertinent part, stated: "For the last 12 months I have taken $800 from registers, I knew this was wrong and it will never happen again. I am a single mom and sometimes get strapped for payday." Plaintiff signed the dictated confession and a promissory note agreeing to pay the store $800, even though plaintiff testified she had no idea where Curtis came up with the $800 figure. Carter, in fact, testified she had "no idea" how the $800 figure was derived. As part of the confession, plaintiff also agreed to pay $150 in so-called investigation costs.

Despite the confession, plaintiff denies she ever took any money from the store. According to plaintiff, she only signed the confession because she was afraid that she would go to jail and that "this man [she] did not know was going to kick [her] ass." She also feared she would not be home when her children returned from school unless she agreed to sign the confession. At that time, plaintiff had two children, ages eight and eleven, one of whom, Cori, was in a "special needs" program at school. As part of the special-needs program, plaintiff had to be home to greet the school bus, because the bus driver would not allow Cori to disembark without plaintiff's assistance.

Curtis testified he knew plaintiff was a single mother. Indeed, at some point during the interview, in the context of discussing possible jail time, Curtis asked plaintiff, "don't [your children] need to come home from school soon?"

Plaintiff testified the interview lasted a total of about three and a half hours, while defendant says it lasted no more than two and a half hours. The parties agree that plaintiff never expressly asked to use the phone, leave the office, or see a union representative.

Defendant fired plaintiff on or about March 6, 2001. Plaintiff was able to secure a new job within a week of defendant's terminating her. Plaintiff, however, alleges she experienced serious emotional distress after the incident involving Curtis. She alleges she could not sleep for the first couple days after the incident. After those couple days, plaintiff says she began sleeping more than usual and stopped eating, causing her to lose weight. She further alleges she did not change clothes for at least a week after the incident.

Plaintiff filed her third amended complaint on May 28, 2004, alleging claims for false imprisonment and intentional inflic-

tion of emotional distress. She seeks compensatory damages for her emotional distress as well as punitive damages. On June 1, 2004, defendant moved for summary judgment against plaintiff's claims and request for punitive damages.[1]

## II. FALSE IMPRISONMENT CLAIM

■ To state a claim for false imprisonment, a plaintiff must show the defendant caused an unlawful confinement of plaintiff. See *Roberts v. Coleman*, 228 Or. 286, 292–93, 365 P.2d 79 (1961); *Walker v. City of Portland*, 71 Or.App. 693, 697, 693 P.2d 1349 (1985). The threshold element of confinement may be satisfied by establishing that the defendant did at least one of four things: (1) put up actual or apparent physical barriers to prevent plaintiff's exit, (2) used physical force to prevent exit, (3) used threats of force to prevent exit, or (4) asserted legal authority to prevent exit. See *Roberts*, 228 Or. at 294, 365 P.2d 79; *Buckel v. Nunn*, 133 Or.App. 399, 405, 891 P.2d 16 (1995). As long as one of these four methods of showing confinement is met, the confinement "need not be for more than a brief time." *Buckel*, 133 Or. App. at 405, 891 P.2d 16 (citing *Lukas v. J.C. Penney Co.*, 233 Or. 345, 353, 378 P.2d 717 (1963)).

■ Of course, the confinement must have been unprivileged to support a claim. See *id.* Confinement is privileged when it qualifies for protection under the statutory "merchant exception." See ORS 131.655. The contours of the exception are as follows:

> Notwithstanding any other provision of law, a peace officer, merchant or merchant's employee who has probable cause for believing that a person has committed theft of property of a store or other mercantile establishment may de-

tain and interrogate the person in regard thereto in a reasonable manner and for a reasonable time.

ORS 131.655(1). Under Oregon's merchant exception, then, the existence of probable cause does not inherently shield the merchant from tort liability; the confinement also must have been consummated in a "reasonable manner and for a reasonable time." *Id.*; see, e.g., *Buckel*, 133 Or.App. at 408, 891 P.2d 16. Whether the confinement was reasonable in manner and time is an issue for the jury unless the court determines that, even "accepting the evidence most favorable to plaintiff, the detention was reasonable." *Delp v. Zapp's Drug & Variety Stores*, 238 Or. 538, 544, 395 P.2d 137 (1964).

Defendant Safeway argues that plaintiff's false-imprisonment claim fails, as a matter of law, for two reasons: (1) there was no confinement, and (2) any confinement is protected by the merchant exception.

### 1. Confinement

■ Construing the record in plaintiff's favor, as the court must, defendant's conduct caused confinement. There was no confinement initially because plaintiff voluntarily accompanied Carter to the office. Nor did closing the office door give rise to confinement. Confinement, however, arose during the course of the interview, as discussed below.

First, the record shows that defendant established a physical barrier to prevent exit. After plaintiff turned to look at the office's closed door and only exit, Carter moved her chair so as to block the exit, evidencing an intent to ensure plaintiff did not try to leave. Based on this conduct, plaintiff testified she felt she could not

---

**1.** The court finds that it need not hear oral argument to resolve defendant's motion. See

Local Rule 7.1(f).

leave the office. These facts are sufficient to create a jury issue as to whether defendant erected a physical barrier to keep plaintiff from leaving the office. See, e.g., *Buckel*, 133 Or.App. at 406, 891 P.2d 16 (allowing jury to decide confinement issue where plaintiff testified she "did not feel free to leave" and security guard "positioned himself between [plaintiff] and the door").

*Roberts v. Coleman*, 228 Or. 286, 365 P.2d 79, upon which defendant relies, does not support granting summary judgment. For instance, unlike the case at bar, the security guard in *Roberts* unequivocally told the suspected employee she was "free to leave at any time." *Id.* at 289, 298, 365 P.2d 79. And at one point, in response to a specific question whether she wanted to end the interview, plaintiff responded she did not wish to end it. *Id.* at 298, 365 P.2d 79.

 Moreover, aside from Carter's using her chair as a physical barrier, evidence of Curtis's verbal threats gives rise to material issues of fact regarding confinement. As stated, Curtis threatened to take plaintiff out back and "kick [her] ass." Curtis also repeatedly indicated plaintiff would be taken immediately to jail if she did not confess. Defendant correctly observes that a threat of force constitutes confinement only when the threat was "such as to create a reasonable apprehension that force will be used for the purpose of effectuating the present confinement." *Roberts*, 228 Or. at 294, 365 P.2d 79; see

also *Lukas*, 233 Or. at 353, 378 P.2d 717. That is, it is only when threats "are relative to a present threatened confinement that they can be said presently to deprive one of liberty." *Roberts*, 228 Or. at 296, 365 P.2d 79. Thus a "mere threat to prosecute in the future" is not sufficient to constitute a confinement. *Id.*

Drawing all inferences in plaintiff's favor, Curtis threatened plaintiff with physical force "for the purpose of effectuating" the confinement. *Id.* at 294, 365 P.2d 79. Curtis made the threat in response to plaintiff's "cocky attitude," which, reading the record in plaintiff's favor, amounted to nothing more than repeated denials of wrongdoing. It is therefore reasonable to infer that Curtis threatened plaintiff in an effort to compel her to stay put and confess to the alleged theft. In addition, plaintiff's evidence shows Curtis made clear that if plaintiff did not confess, proof or no proof, she would immediately be taken to jail and thus would not get home in time to meet her children. On that point, it is notable that in *Roberts* the court made the following observation:

> In *W.T. Grant Co. v. Owens*, 149 Va. 906, 141 S.E. 860 [(1928)], there was direct testimony that plaintiff was told that if she left the office they would take her to jail and that she could go only if she confessed. The threat was geared to her present confinement and was properly held to constitute false imprisonment.

*Id.* at 296–97, 365 P.2d 79 [2]; see also *Buckel*, 133 Or.App. at 406, 891 P.2d 16 (noting,

---

**2.** The facts in *W.T. Grant*, 141 S.E. at 863–66, (cited by the Oregon Supreme Court in *Roberts*) are quite similar to the facts presented in the case at bar. Security personnel at a W.T. Grant store suspected the plaintiff, a store employee, of stealing money from her cash register. A security guard thus took the plaintiff to a cloak room where the guard placed his chair between her and the door. Plaintiff denied taking the money; nevertheless, the guard, knowing the plaintiff was a

single mother, threatened her with jail time unless she confessed to stealing from the store. The guard dictated the confession, and the plaintiff signed it after the guard warned her she would not be home to take care of her child unless she signed the confession. In light of these facts, the Special Court of Appeals of Virginia held that, although the security guard had reasonable cause initially to detain the plaintiff, the guard's conduct

in course of finding confinement to be a jury issue, that security guard "told plaintiff several times that it was up to him to decide whether she would go home or go to jail that evening"). Although Curtis did not expressly tell plaintiff she would go to jail if she left the office, drawing inferences in plaintiff's favor, Curtis wanted plaintiff to understand she would physically be taken to jail unless she admitted to wrongdoing. See, e.g., Plaintiff Depo. at 143, 152 ("[Curtis] kept implying, now, remember, you don't want to go to jail. You need to get home to your children.... He said I will take you to jail if you don't sign the confession.").

In sum, Curtis did not make future threats, in the face of which plaintiff could have freely walked away without confessing, but instead threatened force and jail time with "the purpose of effectuating [a] present confinement." *Roberts*, 228 Or. at 294, 365 P.2d 79; see also *Buckel*, 133 Or.App. at 406, 891 P.2d 16 ("Plaintiff testified that she did not feel that she was free to leave [and] that she believed that the only way for her to go home that evening was to confess to the allegations ...").

## 2. Merchant Exception

 The merchant exception does not save defendant from a trial. Even assuming defendant had probable cause to believe initially that plaintiff had taken some money, material fact issues exist regarding whether the confinement and interrogation were conducted in a "reasonable manner and for a reasonable time." ORS 131.655(1).

Taken together, the facts (read in plaintiff's favor) could cause a jury to conclude defendant acted unreasonably. Although defendant found $60.00 missing from plaintiff's particular register, the record does not undisputably support Curtis's attempt to require plaintiff to pay the store $800.00. Both plaintiff and her boss, Ms. Carter, testified they did not know how that amount was derived. Even assuming the store had lost $800.00, on this record, the court cannot say conclusively it was reasonable for defendant to seek reimbursement of the full amount from plaintiff.[3]

Perhaps most troubling, Curtis used plaintiff's vulnerable position as a single mother to persuade her to sign the confession admitting she stole the $800. Curtis knew plaintiff was a single mother and had to be home to meet her children. Curtis effectively created an unreasonable choice, which did nothing to enhance the reliability of any confession: either confess in writing to stealing an amount of money plaintiff repeatedly denied taking or else fail to get home to meet her minor children who needed her.

Moreover, Curtis essentially gave plaintiff no opportunity to respond or demand proof, repeatedly threatening her with immediate jail time if she even asked about proof. Curtis also preempted any questions plaintiff may have had about his tactics by warning her no one had ever sued him and not to "even think about it." In

---

caused confinement and was unreasonable under the circumstances, thus supporting false imprisonment liability.

3. Ms. Frazer, the store's bookkeeper, testified that $800 had come up missing for the one day at issue (February 22, 2001). On the other hand, the written confession dictated by Curtis stated $800 had been taken over the course of twelve months. In addition, as mentioned, neither plaintiff nor her boss knew why the $800 figure was chosen. Thus it is not established on this record when, if ever, $800 disappeared. In any event, defendant has not conclusively shown a reasonable basis to believe plaintiff was responsible for the full amount of any shortages suffered by the store.

addition, accepting plaintiff's best estimate, the confinement lasted more than three hours, thus making it more likely plaintiff would backtrack on her consistent denials and finally agree to confess, despite Curtis's clear message he did not need any proof to send plaintiff to jail. In addition to threatening jail time, Curtis's frustration with plaintiff's denials caused him to threaten her with physical violence.

] In sum, even accepting defendant's argument it had probable cause initially to confine plaintiff, a jury could find it acted unreasonably "in detaining her with the bullying tactics and threats detailed by her, in an attempt to prove her guilt, or to make her confess that she intended" to steal from the store. *W.T. Grant,* 141 S.E. at 865. Bearing in mind the issue of reasonableness generally is one for the jury, see, e.g., *Buckel,* 133 Or.App. at 407, 891 P.2d 16, the court finds material issues of fact precluding summary judgment on plaintiff's false-imprisonment claim.[4] The court thus turns to plaintiff's second claim.

## III. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

 To state a claim for intentional infliction of emotional distress, a plaintiff must establish three elements: (1) the defendant intended to inflict severe mental or emotional distress; (2) the defendant's acts, in fact, caused plaintiff to suffer se-

vere mental or emotional distress; and (3) the defendant's acts constituted an extraordinary transgression of the bounds of socially tolerable conduct. *McGanty v. Staudenraus,* 321 Or. 532, 543, 901 P.2d 841 (1995); *Patton v. J.C. Penney Co.,* 301 Or. 117, 122, 719 P.2d 854 (1986), *abrogated on other grounds by McGanty,* 321 Or. at 549, 901 P.2d 841. Defendant Safeway challenges all three elements.

### A. Extraordinary Transgression

] The court first considers whether the record shows an extraordinary transgression of the bounds of socially tolerable conduct. The guiding inquiry in resolving this amorphous requirement is whether defendant's conduct can be characterized as " 'extraordinary conduct which a reasonable jury could find beyond the farthest reaches of socially tolerable behavior.' " *MacCrone v. Edwards Ctr., Inc.,* 160 Or.App. 91, 100, 980 P.2d 1156 (1999), *vacated on other grounds by* 332 Or. 41, 22 P.3d 758 (2001), (quoting *Hall v. The May Dep't Stores,* 292 Or. 131, 137, 637 P.2d 126 (1981), *abrogated on other grounds by McGanty,* 321 Or. at 549, 901 P.2d 841). "Conduct that is merely 'rude, boorish, tyrannical, churlish and mean' does not satisfy that standard." *Watte v. Edgar Maeyens, Jr., M.D.,* 112 Or.App. 234, 239, 828 P.2d 479 (1992) (quoting *Patton,* 301 Or. at 124, 719 P.2d 854). Wheth-

---

4. The court notes the Oregon Supreme Court has indicated in dicta that a confinement exceeds proper boundaries when a business attempts during an interrogation to "enforce payment or gain a confession." *Lukas,* 233 Or. at 360, 378 P.2d 717 ("[Oregon law] requires the detention to be made 'in a reasonable manner.' Obviously, the detention may be made only for the purpose of investigating the purported crime and not for some other purpose *such as to enforce payment or gain a confession.*" (emphasis added)).

As discussed, in this case, Curtis both required plaintiff to make a payment and sign a confession. The court, however, does not deny defendant's summary judgment motion because of those facts. First, plaintiff does not argue it was unreasonable per se for defendant to seek a confession and payment. In any event, the court finds the supreme court's dicta in *Lukas* unnecessarily (and thus perhaps unintentionally) broad in light of the fact the governing standard is framed in terms of reasonableness. Accordingly, the court's decision to deny summary judgment is based instead on a consideration of all the particular circumstances taken together.

er particular conduct exceeded the reaches of socially acceptable conduct can only be assessed meaningfully "on a case to case basis." *Rockhill v. Pollard,* 259 Or. 54, 60, 485 P.2d 28 (1971).

 Making that case-to-case assessment is, in the first instance, a question of law for the court. *Harris v. Pameco Corp.,* 170 Or.App. 164, 171, 12 P.3d 524 (2000); *Bourgo v. Canby Sch. Dist.,* 167 F.Supp.2d 1173, 1184 (D.Or.2001). As part of its assessment, the court must consider whether there was a "special relationship" between the parties. See *MacCrone,* 160 Or.App. at 100, 980 P.2d 1156; *Bourgo,* 167 F.Supp.2d at 1184. The existence of a special relationship may tip the balance in favor of finding socially intolerable conduct. An employee-employer relationship is considered a "special" one. *MacCrone,* 160 Or.App. at 100, 980 P.2d 1156 (citing *Hall,* 292 Or. at 138, 637 P.2d 126); see *Bodewig v. K–Mart, Inc.,* 54 Or.App. 480, 486, 635 P.2d 657 (1981) (explaining employer-employee relationship is special because "by the nature of the relationship [employee] is subject to the direction and control of the employer and may be discharged for any or no reason").

 Applying these principles to this case, plaintiff avoids summary judgment. As an initial point, however, the court agrees with some of the propositions suggested in defendant's briefing: For example, as a general matter, an employer who reasonably suspects an employee of wrongdoing may reveal anger and lodge accusations without running the risk of transgressing acceptable social standards. See, e.g., *Watte,* 112 Or.App. at 237–39, 828 P.2d 479 (finding insufficient evidence of intolerable conduct where employer angrily accused employees of being liars and saboteurs). Nor is an extraordinary transgression shown by an employer's "excessive supervision and unjustified reprimands." *Snyder v. Sunshine Dairy,* 87 Or.App. 215, 218, 742 P.2d 57 (1987). The court further agrees that an employer with a well-founded belief of wrongdoing is not liable for merely threatening an employee with jail time or prosecution. See *Smithson v. Nordstrom, Inc.,* 63 Or.App. 423, 429, 664 P.2d 1119 (1983).

Oregon courts, however, have found cognizable intentional-infliction claims in the employment context, after carefully weighing the particular facts presented. For example, in *Hall v. May Department Stores,* 292 Or. at 133, 637 P.2d 126, the Oregon Supreme Court found an extraordinary transgression of social standards in the way a department store interrogated an employee suspected of stealing from the store's cash register. The court determined the record allowed a jury to find that the security guard "attempted to threaten and frighten plaintiff as a deliberate tactic even though he knew that he did not have convincing evidence of misconduct on her part." *Id.* at 139, 637 P.2d 126. Among other things, the guard told plaintiff that store personnel had proof she was stealing from her registers and that he could not help her avoid jail unless she told the truth. *Id.* at 140, 637 P.2d 126. The court concluded, "if a jury, drawing all possible inferences favorable to plaintiff, found an intentionally oppressive method of browbeating an employee into a confession, it could also decide that this method went beyond the outer bounds of socially tolerable employer practices." *Id.* at 141, 637 P.2d 126.

The Oregon Court of Appeals has likewise found sufficient evidence to satisfy the extraordinary-transgression element in cases involving overbearing conduct by an employer. In *Buckel v. Nunn,* 133 Or. App. at 405, 891 P.2d 16, for example, the court concluded a jury could find the employer's confinement and interrogation of an employee socially intolerable. Accused

of stealing from the employer store, the plaintiff employee endured "nearly three hours of interrogation" in a small storage room where the guard positioned himself between the plaintiff and door. *Id.* at 403–04, 891 P.2d 16. The defendant gave the plaintiff the chance to make only one phone call. *Id.* During the interrogation, the employer's security guard gave the plaintiff the choice of confessing or going to jail, but did not "offer any evidence to corroborate his accusations." *Id.* at 402–03, 891 P.2d 16. Although the initial investigation led the defendant to believe only that the plaintiff had stolen money, the defendant's security guard pressed her to admit also to stealing merchandise and lottery tickets despite the lack of evidence to support such allegations. *Id.* at 402, 404, 891 P.2d 16. In the face of the employer's relentlessness, plaintiff confessed but "only because she wanted to go home and . . . was intimidated by the interrogation." *Id.* at 404–05, 891 P.2d 16. Confronted with these facts, the court believed "a jury could conclude that defendant's conduct exceeded the bounds of social toleration." *Id.;* see also *Smithson,* 63 Or. App. at 425–27, 664 P.2d 1119 (finding jury could find socially intolerable conduct where security officers indicated to plaintiff the store had sufficient evidence of her wrongdoing despite evidence suggesting officers "did not reasonably believe they had sufficient evidence to charge her with a crime," and told plaintiff they "would call the police and have her taken to jail if she did not sign a confession").

 In the case at bar, reading the record in plaintiff's favor, the evidence is sufficient under Oregon law to make the necessary threshold showing of socially intolerable conduct. As already discussed, while defendant may have reasonably believed plaintiff had stolen $60.00, there are material issues of fact about whether plaintiff reasonably could have been blamed for stealing $800.00. Curtis did not, of course,

give plaintiff a chance to challenge the accusation, telling her she would go to jail if she raised any objection. In fact, he responded to her denials with a threat of physical violence. Plaintiff also testified Curtis ultimately gave her the choice of either confessing to stealing the $800.00 or going to jail. In light of these facts, the jury could find that defendant used "browbeating" to obtain a confession for a theft of $800.00 "upon scanty evidence." *Hall,* 292 Or. at 142, 637 P.2d 126.

In compelling plaintiff to sign a confession, which Curtis had dictated to her, Curtis not only used a threat of jail time but also used plaintiff's minor children against her as leverage. Curtis's taking advantage of plaintiff's vulnerable position as a single parent of two minor children (including one in a "special needs" program) rose to the level of an "abusive," and arguably "cold-blooded," business tactic. *Id.* at 136, 141–42, 637 P.2d 126 (observing that there is a "well-recognized line of [emotional-distress] cases involving personally abusive business tactics . . . against inexperienced and vulnerable individuals," and finding that a defendant's "cold-blooded tactic of interrogation" created jury issues (citation omitted)). Added to these facts is the presence of a special relationship between plaintiff, an employee, and defendant, her employer. See *MacCrone,* 160 Or.App. at 100, 980 P.2d 1156. In sum, on this record, a reasonable jury could conclude that defendant's conduct went "beyond the farthest reaches of socially tolerable behavior." *Id.* (citation omitted).

## B. Intent

 An emotional-distress claim's intent element is satisfied when there is evidence the defendant desired " 'to inflict severe emotional distress' " or he knew such distress was " 'certain, or substantially certain, to result from his conduct.' "

*McGanty*, 321 Or. at 550, 901 P.2d 841 (quoting Restatement (Second) of Torts § 46 comment i). In the usual case, evidence which satisfies the extraordinary-transgression element (discussed *supra*) will also create a fact issue regarding the intent element. See *Buckel*, 133 Or.App. at 404, 891 P.2d 16 ("[Defendant] acknowledges that the requisite intent can be inferred from outrageous conduct."); see also *Bodewig*, 54 Or.App. at 487–88, 635 P.2d 657 (concluding jury could "find that [defendant's] entire course of conduct was intended to embarrass and humiliate plaintiff in order to coerce her into giving [defendant money]," and observing "the mere fact that [defendant's] stated ultimate objective was to get her money back is not sufficient to defeat" claim). Allowing a jury generally to find the requisite intent when the extraordinary-transgression element is met makes sense given the plaintiff must show truly outrageous conduct to satisfy the latter element.

█ In this case, the court concludes the facts are such that a jury could infer that defendant intended to cause severe emotional distress or at least knew such distress was "substantially certain" to result. As stated, among other things, Curtis threatened violence and deliberately used plaintiff's status as a single mother to compel her to confess to a crime she repeatedly denied committing.

## C. Severe Emotional Distress

█ The plaintiff must prove that severe emotional distress has "in fact resulted." Restatement (Second) Torts § 46 comment j. "It is for the court to determine whether on the evidence severe emotional distress can be found; it is for the jury to determine whether, on the evidence, it has in fact existed." *Id.* To guide courts in assessing whether the alleged distress was sufficiently severe, the drafters of the Restatement explained:

Complete emotional tranquility is seldom attainable in this world, and some degree of transient and trivial emotional distress is a part of the price of living among people. The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it. The intensity and the duration of the distress are factors to be considered in determining its severity. Severe distress must be proved; but in many cases the extreme and outrageous character of the defendant's conduct is in itself important evidence that the distress has existed....

*Id.* Thus a plaintiff cannot recover "for the kind of temporary annoyance or injured feelings that can result from friction and rudeness among people in day-to-day life." *Hall*, 292 Or. at 135, 637 P.2d 126. The plaintiff, however, need not prove the existence of severe emotional distress through "objective evidence of the distress, such as medical, economic, or social problems." *Bodewig*, 54 Or.App. at 488, 635 P.2d 657.

█ In this case, plaintiff's evidence of emotional distress is not overwhelming. She testified she cried a lot and could not sleep for a couple of days following the incident. After that brief period of not being able to sleep, plaintiff stated she began sleeping more than usual and stopped eating as much as usual, all as a result of defendant's confinement and interrogation of her. Although plaintiff does not explain how long she experienced these symptoms, she testified she did not change her clothes for a week after the incident, presumably because she felt depressed. She obtained a new job not long after being fired.

Whether these facts are enough to show *severe* emotional distress is a close question. Ultimately, however, bearing in mind that plaintiff's evidence suggests particularly egregious conduct, the court con-

cludes that plaintiff's alleged distress exceeded "temporary annoyance or injured feelings," *Hall*, 292 Or. at 135, 637 P.2d 126, and the mere "price of living among people," Restatement (Second) of Torts § 46 comment j. See, e.g., *Bodewig*, 54 Or.App. at 488, 635 P.2d 657 (finding sufficient evidence of severe emotional distress where plaintiff "had two or three sleepless nights, cried a lot and still gets nervous and upset when she thinks about the incident," which caused her "shock, humiliation and embarrassment"). In sum, plaintiff has presented sufficient evidence to defeat summary judgment on the issue of whether she in fact suffered severe emotional distress.

### D. Workers' Compensation Exclusivity

 Defendant finally argues that, even assuming plaintiff could prove the elements of her emotional-distress claim, that claim nevertheless is barred by the exclusive-remedy provisions of Oregon's workers' compensation law. Under that law: "Workers who are injured in the course and scope of employment are entitled to receive certain benefits from their employers, and, with some notable exceptions, those benefits are exclusive of all other remedies that would otherwise be available to the worker." *Hanson v. Versarail Sys., Inc.*, 175 Or.App. 92, 95, 28 P.3d 626 (2001). An important exception to exclusivity is met when the employer caused the worker's injury with "deliberate intention." ORS 656.156(2).

Defendant cites a recent court of appeals decision in support of its argument plaintiff's emotional-distress claim is barred. See *Stone v. Finnerty*, 182 Or. App. 452, 50 P.3d 1179 (2002). That case, however, did not involve an emotional-distress claim; rather, the court decided that a false-imprisonment claim was not barred by workers' compensation's exclusivity principle and that a battery claim was

barred. *Id.* at 460, 50 P.3d 1179. While defendant fails to cite any Oregon case law concluding that the exclusivity principle bars emotional-distress claims, plaintiff cites Oregon case law reaching the opposite conclusion. See *MacCrone*, 160 Or. App. at 99–100, 980 P.2d 1156 (rejecting argument emotional-distress argument was barred by workers' compensation law because jury could infer defendant acted intentionally to injure plaintiff). This court also has exempted an emotional-distress claim from the workers' compensation law. See *McMellon v. Safeway Stores, Inc.*, 945 F.Supp. 1402, 1408 (D.Or. 1996).

As discussed *supra*, Curtis chose a course of action based on threats of jail time, physical violence, and denying plaintiff the chance to meet her children. The court believes defendant's conduct could lead a reasonable jury to conclude it deliberately intended to cause plaintiff emotional distress. Moreover, absent more specific guidance from Oregon courts on this important issue, the court is particularly hesitant to accept defendant's invitation to announce a rule regarding the relationship of emotional-distress claims to the workers' compensation law.

### E. Punitive Damages

Defendant finally argues that there is insufficient evidence to support an award of punitive damages. See ORS 31.730(1).

Defendant's argument is based on a selective reading of the record, emphasizing that Curtis never raised his voice, plaintiff never expressly asked to leave the office, and no one physically touched plaintiff. Defendant ignores most of the key evidence creating material issues of fact regarding the merits of plaintiff's claims, see *supra*. The court believes the evidence, read in plaintiff's favor, makes it premature to enter judgment against plaintiff's prayer for punitive damages. See, e.g.,

*Buckel,* 133 Or.App. at 408–09, 891 P.2d 16 (allowing award of punitive damages to stand against plaintiff employee's boss, even though he "did not verbally abuse [plaintiff or] bring about or threaten to bring about criminal proceedings," because, *inter alia,* he pressed plaintiff to admit to stealing merchandise and lottery tickets, allegations lacking persuasive evidence).

## IV. CONCLUSION

For the foregoing reasons, the court DENIES defendant Safeway's motion for summary judgment (doc. # 77). The court finds there are simply too many fact issues to hold that plaintiff, as a matter of law, cannot prove her claims. Defendant's motion to strike is DENIED AS MOOT (doc. # 89).

IT IS SO ORDERED.